ACCEPTED
05-17-01096-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
3/26/2018 6:39 PM
LISA MATZ
CLERK

**ORAL ARGUMENT REQUESTED**

## No. 05-17-01096-CV

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
3/26/2018 6:39:03 PM
LISA MATZ
Clerk

In The

# COURT OF APPEALS

FIFTH DISTRICT OF TEXAS
Dallas, Texas

## BCH DEVELOPMENT, LLC,

*Appellant,*

v.

## LAKEVIEW HEIGHTS ADDITION PROPERTY OWNERS' ASSOCIATION and BARBARA WOHLRABE,

*Appellees.*

On Appeal from Cause No. CC-13-05900-A
In the County Court at Law No. 1 of Dallas County, Texas
Honorable D'Metria Benson, Presiding Judge

## REPLY BRIEF FOR APPELLANT

| | |
|---|---|
| Michael A. Yanof | Shelby Hall |
| State Bar No. 24003215 | State Bar No. 24003215 |
| Lenahan Law, P.L.L.C. | Thompson, Coe, Cousins & Irons, L.L.P. |
| 2655 Villa Creek, Suite 204 | |
| Dallas, Texas 75234 | 700 North Pearl St., 25th Floor |
| Telephone: (214)295-1008 | Dallas, Texas 75201 |
| Facsimile: (214) 295-2664 | Telephone: (214) 871-8200 |
| Email: Yanof@lenahanlaw.com | Facsimile: (214) 871-8209 |

**ATTORNEYS FOR APPELLANT**

**FOR THE COURT'S CONVENIENCE**

BCH Development, LLC was the Defendant in the trial court and is the Appellant herein. For convenience it is referred to as "BCH" or "Appellant."

Lakeview Heights Addition Property Owners' Association and Barbara Wohlrabe were the Plaintiffs in the trial court and are the Appellees herein. For convenience, they are referred to collectively as "Wohlrabe," "LHPOA," or "Appellees."

The Clerk's Record and Reporter's Record are multiple volumes and cited with the volume number in front of the abbreviated "CR" or "RR" designation, followed by the page number as reflected in the lower, right-hand corner for the Clerk's Record and the upper right-hand corner for the Reporter's Record. The Supplemental Clerk's Record is also multiple volumes and cited with a volume number in front of the abbreviated "SCR" designation, followed by the page number as reflected in the lower, right-hand corner for the Supplemental Clerk's Record.

Appendix items are attached to this Brief and abbreviated as "Apx. Tab ___."

# TABLE OF CONTENTS

FOR THE COURT'S CONVENIENCE..............................................................2

TABLE OF CONTENTS.............................................................................3

INDEX OF AUTHORITIES.........................................................................6

ARGUMENT........................................................................................10

    I.     Because Restrictive Covenant 1 is ambiguous, it must be strictly construed in favor of BCH's free and unrestricted use of the property.............................................................10

          A.    Wohlrabe's argument ignores the more pertinent definitions contain in the 1951 and current building codes.............................................................13

                1.    BCH properly preserved its argument regarding the 1951 Dallas Building Code................13

                2.    The 1951 Dallas Building Code definitions demonstrate that the restrictive covenant is susceptible to more than one reasonable interpretation.........................................14

          B.    Courts in Texas and elsewhere have held similar covenants ambiguous........................................17

                1.    The Dallas County District Court ruling in *Dienes v. LTG Vegan Ltd.* is not instructive in this case...................................................17

                2.    Courts of appeal across various jurisdictions have held similar deed restriction language ambiguous as a matter of law ...........................18

                3.    The Arizona, Arkansas, Nevada, and California cases cited by Wohlrabe are not instructive and should not be considered by this Court .............................................21

C.    The evidence in the summary judgment record demonstrates the ambiguity of the phrase "one story in height" ........................................................... 23

      1.    BCH did not waive its argument that its proposed habitable attic was not a second story ..................................................................... 23

      2.    Wohlrabe's objections to Blanchard and Shekter's affidavits are unfounded and were waived ................................................................. 24

      3.    Conflicting expert testimony bolsters BCH's allegation that "one story in height" is susceptible to more than one interpretation ......... 26

      4.    Testimony from Wohlrabe and Wohlrabe's expert further demonstrates the ambiguity of the phrase "one story in height" ........................... 28

D.    Wohlrabe's subjective interpretation of the Restrictive Covenant 1 renders it meaningless .............. 29

II.    BCH's affirmative defenses of impossibility, waiver, estoppel, and unclean hands precluded summary judgment ...................... 30

A.    The trial court erred in granting summary judgment and denying BCH's Motion to Reconsider because there was a fact issue on BCH's affirmative defense of impossibility ............................................................... 30

B.    The trial court erred in granting summary judgment as to BCH's waiver defense ............................................ 32

C.    The trial court erred in granting summary judgment as to BCH's estoppel defense ........................................... 34

D.    The trial court erred in granting summary judgment as to BCH's unclean hands defense ................................ 36

III.    The trial court abused its discretion when it denied BCH's Motion to Dissolve Due to Changed Circumstances ...................... 38

4

IV.   The trial court erred when it granted summary judgment as to BCH's counter claims against Wohlrabe and the other members of the LHPOA ................................................................ 39

CONCLUSION ................................................................................ 40

PRAYER .......................................................................................... 42

CERTIFICATE OF SERVICE ........................................................ 44

CERTIFICATE OF COMPLIANCE .............................................. 45

APPENDIX

Relator's Petition for Writ of Mandamus
(Case No. 05-16-01481-CV)                                    Tab 1

Opinion (Case No. 05-16-01481-CV)                            Tab 2

# INDEX OF AUTHORITIES

**Cases**

*Dyegard Land P'ship v. Hoover,*
    39 S.W.3d 300 (Tex. App.—Fort Worth 2001, no pet.) ......................11

*Allen v. Reed,*
    155 P.3d 443 (Colo. Ct. App. 2006) ................................................. 19

*Balandran v. Safeco Ins. Co. of Am.,*
    972 S.W.2d 738 (Tex. 1998)............................................................ 12

*Calpine Constr. Fin. Co. v. Arizona Dep't of Revenue,*
    211 P.3d 1228 (Ariz. Ct. App. 2009)................................................ 21

*Chase Manhattan Bank v. Bowles,*
    52 S.W.3d 871 (Tex. App.—Waco 2001, no pet.) ..............................38

*Cimarron Country Prop. Owners Ass'n v. Keen,*
    117 S.W.3d 509 (Tex. App.—Beaumont 2003, no pet.).....................34

*City of Pasadena v. Gennedy,*
    125 S.W.3d 687
    (Tex. App.—Houston [1st Dist.] 2003, pet. denied)...........................11

*Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,*
    940 S.W.2d 587 (Tex. 1996).............................................................11

*Crispin v. Paragon Homes, Inc.,*
    888 S.W.2d 78
    (Tex. App.—Houston [1st Dist.] 1994, writ denied)...........................29

*Dickstein v. Williams,*
    571 P.2d 1169 (Nev. 1977)............................................................... 21

*El Paso Nat'l Bank v. Southwest Numismatic Inv. Grp., Ltd.,*
    548 S.W.2d 942 (Tex. Civ. App.—El Paso 1977, no writ) ...................35

*Fallis v. River Mountain Ranch Prop. Owners Ass'n,*
    No. 04-09-00256-CV, 2010 WL 2679997
    (Tex. App.—San Antonio July 7, 2010, no pet.) .................................40

*Fong v. Hashimoto,*
    977 P.2d 878 (Haw. 2000)................................................................. 19

*Hiner v. Hoffman,*
    977 P.2d 878 (Haw. 1999)........................................................ 19, 20

*Holmesley v. Walk,*
    39 S.W.3d 463 (Ark. Ct. App. 2001) ................................................ 21

*In re BCH Dev., LLC,*
    525 S.W.3d 920 (Tex. App.—Dallas 2017) (orig. proceeding) ........... 41

*Inwood N. Homeowners Ass'n v. Harris,*
    736 S.W.2d 632 (Tex. 1987) ............................................................36

*Jennings v. Bindseil,*
    258 S.W.3d 190 (Tex. App.—Austin 2008, no pet.) .......................... 10

*Johnson v. Linton,*
    491 S.W.2d 189 (Tex. App.—Dallas 1973, no writ)...... 18, 19, 23, 26, 27

*King v. Kugler,*
    17 Cal. Rptr. 504 (Cal. Ct. App. 1961)................................................ 21

*Lopez v. Munoz, Hockema & Reed, L.L.P.,*
    22 S.W.3d 857 (Tex. 2000) ..............................................................34

*Metius v. Julio,*
    342 A.2d 348 (Md. Ct. Spec. App. 1975) .......................................... 19

*Morton v. Paradise Code Prop. Owners Ass'n,*
    No. 11-09-00022-CV, 2009 WL 2841208
    (Tex. App.—Eastland Sept. 3, 2009, no pet.) (mem. op.) ..................20

*Musgrave v. Brookhaven Lake Prop. Owners Ass'n,*
    990 S.W.2d 386 (Tex. App.—Texarkana 1999, pet. denied) ..............35

*Nash v. Beckett,*
     365 S.W.3d 131 (Tex. App.—Texarkana 2012, pet. denied) ............... 35

*New Jerusalem Baptist Church, Inc. v. City of Houston,*
     598 S.W.2d 666 (Tex. App.—Houston 1980, no writ) ................ 32, 33

*Park v. Escalera Ranch Owners' Ass'n, Inc.,*
     457 S.W.3d 571 (Tex. App.—Austin 2015, no pet.)............................ 37

*Pebble Beach Prop. Owners' Ass'n v. Sherer,*
     2 S.W.3d 283 (Tex. App.—San Antonio 1999, pet. denied) ................11

*Pilarcik v. Emmons,*
     966 S.W.2d 474 (Tex.1998) ........................................... 11, 12, 22, 38

*Pinnacle Peak Ranchos Prop. Owners Ass'n v. Ramioulle,*
     No.1 CA-CV 14-0409, 2015 WL 8475067
     (Ariz. Ct. App. Dec. 10, 2015)........................................................ 21

*Price v. Kravitz,*
     1 CA-CV 10-0889, 2012 WL 1380269
     (Ariz. Ct. App., April 19, 2012) ................................................. 21, 22

*Ridgepoint Rentals, LLC v. McGrath,*
     No. 09-16-00393-CV, 2017 WL 6062290
     (Tex. App.—Beaumont Dec. 7, 2017, pet. filed) .................................11

*S&I Mgmt., Inc. v. Sungju Choi,*
     331 S.W.3d 849 (Tex. App.—Dallas 2011, no pet.)............................ 25

*Simon Prop. Grp. L.P. v. May Dep't Stores Co.,*
     943 S.W.2d 64 (Tex. App.—Corpus Christi 1997, no writ) .................11

*Stimpson v. Plano Indep. School Dist.,*
     743 S.W.2d 944 (Tex. App.—Dallas 1987, writ denied) ............... 34, 35

*Universal Health Servs., Inc. v. Thompson,*
     24 S.W.3d 570 (Tex. App.—Austin 2000)..........................................38

*Wiese v. Heathlake Cmty Ass'n, Inc.,*
    384 S.W.3d 395
    (Tex. App.—Houston [14th Dist.] 2012, no pet.) ...............................11

*Wilmoth v. Wilcox,*
    734 S.W.2d 656 (Tex. 1987) ......................................................10, 12

## Statutes

Tex. Civ. Prac. & Rem. Code § 16.069 .......................................................40

Tex. Prop. Code § 202.003(a) ................................................................. 10

**ARGUMENT**

## I. Because Restrictive Covenant 1 is ambiguous, it must be strictly construed in favor of BCH's free and unrestricted use of the property

Covenants restricting the free use of land are not favored by the courts, but will be enforced if they are clearly worded and confined to a lawful purpose. *See, e.g.*, *Jennings v. Bindseil*, 258 S.W.3d 190, 194–95 (Tex. App.—Austin 2008, no pet.) (citing *Wilmoth v. Wilcox*, 734 S.W.2d 656, 657 (Tex. 1987)). When the language of a restrictive covenant is unambiguous, it is liberally construed to give effect to its purpose and intent. *Id.* at 195; Tex. Prop. Code § 202.003(a).

However, if the language is found to be ambiguous, the restrictive covenant is construed strictly against the party seeking to enforce the restriction, and all doubts must be resolved in favor of the free and unrestricted use of the property. *Wilmoth*, 734 S.W.2d at 657.

Wohlrabe's attempt to distinguish the Texas Supreme Court's holding in *Wilmoth* falls flat. Wohlrabe argues *Wilmoth* is inapplicable because it was decided before § 202.003(a) was enacted.[1] This in incorrect—it was decided after §202.003(a) was enacted. More importantly, the Texas Supreme Court more recently refused to find that § 202.003(a) supplanted *Wilmoth* and its analysis. *See Pilarcik v. Emmons*, 966 S.W.2d 474, 478–

---

[1] *See* Appellees' Br. at 22, fn 5.

80 (Tex.1998). This is precisely why a majority of the Texas courts of appeals have adopted the *Wilmoth* holding that when a deed restriction is ambiguous, it must be "strictly construed against the party seeking to enforce the restriction, and all doubts must be resolved in favor of the free and unrestricted use of the property." *Jennings*, 258 S.W.3d at 195.[2] Wohlrabe's suggestion that there is no authority to support BCH's contention that ambiguous covenants must be strictly construed against the party seeking to enforce them is therefore a blatant misrepresentation.

Whether a restrictive covenant is ambiguous is a question of law that must be decided by examining the covenant as a whole in light of the circumstances present when it was drafted. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). Restrictive covenants are subject to the general rules of contract construction. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex.1998). Like a contract, restrictive covenants are unambiguous as a matter of law if they can be given a definite or certain legal meaning. *Id.* at 478. On the other

---

[2] *Accord Dyegard Land Partnership v. Hoover*, 39 S.W.3d 300, 308–09 (Tex. App.—Fort Worth 2001, no pet.); *Pebble Beach Prop. Owners' Ass'n v. Sherer*, 2 S.W.3d 283, 287–88 (Tex. App.—San Antonio 1999, pet. denied); *City of Pasadena v. Gennedy*, 125 S.W.3d 687, 694–95 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); *Simon Prop. Grp. L.P. v. May Dep't Stores Co.*, 943 S.W.2d 64, 71 (Tex. App.—Corpus Christi 1997, no writ); *Wiese v. Heathlake Cmty Ass'n, Inc.*, 384 S.W.3d 395, 402–03 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Ridgepoint Rentals, LLC v. McGrath*, Case No. 09-16-00393-CV, 2017 WL 6062290, at *7 (Tex. App.—Beaumont 2017, pet. filed).

hand, restrictive covenants that are susceptible to more than one reasonable interpretation are ambiguous as a matter of law, even if one interpretation appears more reasonable than another. *Id.*; *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998). Importantly, the words and phrases in the restrictive covenant must not be enlarged, extended, changed, or stretched by construction. *Wilmoth*, 734 S.W.2d at 657–58.

The language used in Restrictive Covenant 1—"one story in height"—is ambiguous on its face. The covenants do not prohibit attics and there is no definition regarding what constitutes a "story" and, more specifically, what kind of attic is not permitted. Moreover, while Restrictive Covenant 1 is a restriction based on "height," the covenants fail entirely to provide what constitutes excessive "height" in violation of the covenant. This not only creates ambiguity, but by Wohlrabe's expert's own testimony, makes Restrictive Covenant 1 arbitrary, as a home could be 40 feet tall (tall enough to be a three-story home), so long as there is no usable space over the ground floor. BCH's contention is supported by (1) pertinent definitions of the 1951 Dallas Building Code, (2) all relevant case law, and (3) the evidence in the summary judgment record.

### A. Wohlrabe's argument ignores the more pertinent definitions contain in the 1951 and current building codes

In the summary judgment record and in Appellees' Brief, Wohlrabe cites the 1940, 1952, and 1956 dictionary definitions of "story" and "height" to show their "generally accepted meaning" at the time the restrictive covenants were created—which, generally, stated that a "story" was a set of rooms on the same floor of a building and "height" meant a distance upward from the ground. (4 CR 4161–66.) But contrary to Wohlrabe's assertion that these dictionary definitions in and of themselves give the restrictive covenant at issue a definite and certain meaning, there were other applicable and relevant definitions that existed at the time the covenants were written within the 1951 Dallas Building Code.

#### 1. BCH properly preserved its argument regarding the 1951 Dallas Building Code

Wohlrabe asserts that BCH waived its ambiguity arguments arising from the 1951 Dallas Building Code's definition of "attic story." This is inaccurate.

The 1951 Dallas Building Code was expressly addressed in Wohlrabe's Motion for Summary Judgment. (4 CR 4163.) Moreover, the 1951 Dallas Building Code Provisions—including the term "attic story"—were discussed at length in the summary judgment evidence submitted by BCH, including:

the affidavit of Frank Blanchard, the testimony of Wohlrabe, and the Amended Affidavit of Mark Shekter. (3 SCR 72–102, 177–78; 6 CR 5512–29.) All of these exhibits were cited in BCH's summary judgment response and amended response in support of BCH's argument that the language in the restrictive covenant is ambiguous. (5 CR 4637–4688; 6 CR 5371–5425.) Accordingly, Wohlrabe's claim that BCH's argument that the 1951 Building Code provisions support BCH's assertion of ambiguity is meritless.

### 2. The 1951 Dallas Building Code definitions demonstrate that the restrictive covenant is susceptible to more than one reasonable interpretation

The 1951 Dallas Building Code, which was in force at the time the restrictions were written, contained a separate definition for "story," attic" and "attic story." Specifically, "story" is defined as:

> That portion of a building included between the upper surface of any floor and the upper surface of the floor next above, except that the topmost story shall be that portion of a building included between the upper surface of the topmost floor and the ceiling above.

The 1951 Code defines "attic" as:

> Any space situated between a roof and ceiling immediately below and not used for business, storage, or habitation.

"Attic story" is defined as:

14

Any story situated whole or partly in the roof, so designated, arranged or built as to be used for business, storage, or habitation.

(Appellant's Br. at Apx. Tab L.) Whether or not an "attic story" was considered a "story" is not mentioned or defined in the 1951 Code, but the specific inclusion of "attic story" in the Code indicates that an "attic story" is not the same as a "story" in the general sense. Moreover, most houses in the addition do have an "attic story" under the 1951 definitions.

Most importantly, the 1951 Dallas Building Code states an "attic story"—a finished-out attic for habitation—is not the same as "story." The restrictive covenants at issue do not prohibit attics from being used for storage or habitation, nor are the terms "attic" or "attic story" mentioned in the deed restrictions. Thus, the 1951 Code alone creates an ambiguity as to whether habitable attics are prohibited under the restrictive covenants at issue and whether an "attic story," which is separately defined under the Code, is considered a "story" within the meaning of the deed restrictions.

Wohlrabe argues that "simply because the Restrictive Covenants don't expressly prohibit 'attic stories' does not mean the creators did not intend to prohibit them. . ." Appellees' Br. at 31–32. However, Wohlrabe has presented no evidence that the creators of the covenants *did* intend to prohibit attic stories. And, despite the clear distinctions between "attic,"

15

"attic story," and "story" in the very regulations which governed building in Dallas at the time the covenants were written, the creators chose to use the more general phrase "one story in height." Moreover, rather than "nullifying" Restrictive Covenant 1 as Wohlrabe claims, BCH's interpretation simply provides an alternative interpretation—that Restrictive Covenant 1 does not prohibit certain types of attics. This creates unmistakable ambiguity, which mandates that the restrictive covenant be strictly construed toward the free and unrestricted use of the property.

Wohlrabe belabors the point that the only relevant sources for determining the deed restrictions are those that were in existence at the time the covenants were drafted (such as the 1951 Dallas Building Code). Yet it is still instructive to compare the 1951 provisions to the present day IRC provisions, for doing so highlights the trend of Dallas building codes to draw a distinction between a traditional "story" and an "attic/habitable attic/attic story." Notably, the 2012 and 2015 IRCs "habitable attic" definition is very similar to the definition of "attic story" contained in the 1951 version of the Dallas Building Code, which governed residential construction in Dallas at the inception of the Addition's deed restrictions. In fact, the only difference between the IRC definition of "habitable attic" and the 1951 Dallas Building Code definition of "attic story" is that under

the modern day definition of "habitable attic," the exact same attic space would have been defined as an "attic story" in 1951 and must now comply with certain safety requirements, whether the attic is finished or unfinished. Further, a "habitable attic" under the 2012 IRC definitions is, by the IRC's exact words, "not considered a story."

Wohlrabe's argument that the Restrictive Covenant 1 has a "definite legal meaning" rests on dictionary definitions, rather than the more pertinent definitions set out in the 1951 Dallas Building Code and IRC, which reveal there is more than one reasonable interpretation of the phrase "one story in height." This creates ambiguity which compels this Court to strictly construe the restrictive covenants against Wohlrabe and resolve the ambiguity favorably toward BCH's free and unrestricted use of the property.

### B. Courts in Texas and elsewhere have held similar covenants ambiguous

#### 1. The Dallas County District Court ruling in *Dienes v. LTG Vegan Ltd.* is not instructive in this case

Wohlrabe cites the 191st District Court's Findings of Fact and Conclusions of Law in the 2005 case *Dienes v. LTG Vegan Ltd.* (Cause No. 04-10084-J) in support of her argument that the phrase "one story in height" is not ambiguous as a matter of law. Appellee's Br. at 28. Notably,

17

these findings of fact and conclusions of law do not discuss whether there is language in those restrictions that define the "height" or whether there was an active ACC in that case. Further, there is no record or opinion from a court of appeals discussing the merits of the case, as the case was never appealed. Accordingly, the 191st District Court's findings of fact and conclusions of law are not legal authority and should not be considered by this Court.

### 2. Courts of appeal across various jurisdictions have held similar deed restriction language ambiguous as a matter of law

In *Johnson v. Linton*, 491 S.W.2d 189 (Tex. App.—Dallas 1973, no writ), this Court reviewed a deed restriction which prohibited the building of houses that exceeded "one and one-half (1-1/2) story in height." *Id.* at 191. In that case, the homeowner sought to add two rooms and a bath above his garage, which the homeowner claimed constituted a "one-half story." *Id.* The Court reasoned that because it could not say that "the restrictive recitations are so clear that but one reasonable meaning for each respective phrase ha[d] clearly emerged," the restriction was ambiguous and must be construed against the party seeking its enforcement. *Id.* at 197.

Similar restrictions have been interpreted by many other courts in varying jurisdictions to be ambiguous—several of which have cited the

*Johnson* case out of this Court. *See Allen v. Reed*, 155 P.3d 443, 445-46 (Colo. Ct. App. 2006) (citing *Johnson* in holding deed restriction that height of dwelling house "shall not exceed one story in height, measured from finished grade" was ambiguous and unenforceable); *Fong v. Hashimoto*, 977 P.2d 878, 880-83 (Haw. 2000) (holding that the term "one story in height" in the deed restriction was ambiguous and unenforceable); *Hiner v. Hoffman*, 977 P.2d 878, 880-83 (Haw. 1999) (citing *Johnson*, 491 S.W.2d at 196-97) ("The indeterminate "two story" language, in our view, is not only ineffectual to achieve that purpose but ambiguous when applied to the case at bar."); *Metius v. Julio*, 342 A.2d 348 (Md. Ct. Spec. App. 1975) ("The equitable height restriction does not limit the buildings to 'three stories' but rather to 'three stories in height.' We are persuaded that the meaning of the express 'three stories in height' used in this particular equitable restriction, is ambiguous."). These courts frequently emphasize that a building may have two "stories" and yet not exceed one story *in height. Hiner*, 977 P.2d at 882; *Metius*, 342 A.2d at 354. Conversely, an interpretation that a restriction limiting a structure to one story in height prohibited any home with any living space on the second "story" would both render the phrase "in height" superfluous, *Allen*, 155 P.3d at 445, and lead to absurd results, such as:

19

1. a 35-foot-high one-story house would comply with the restriction but a 20-foot-high two story house wouldn't, *Allen*, 155 P.3d at 445-46; *Hiner*, 977 P.2d at 881-82; and

2. one home could violate the restriction merely because there is usable space on the two floors while another home, identical from the outside, would not violate the restriction if there were no useable second floor. *Allen*, 155 P.3d at 445-46.[3]

Indeed, for this latter reason, the Eastland Court of Appeals has held that homes with finished portions of the attic are one-story homes as a matter of law, because on the outside they appeared to be one-story homes. *Morton v. Paradise Code Prop. Owners Ass'n*, No. 11-09-00022-CV, 2009 WL 2841208, at *5 (Tex. App.—Eastland Sept. 3, 2009, no pet.) (mem. op.). In *Morton*, the court reasoned that the obvious purpose of the one-story limitation was to protect the view of other property owners within the subdivision. *Id.* Thus, the homes complied with the deed restriction because the homes appeared to be one-story homes when viewed from the exterior despite a finished attic space. *Id.*

---

[3] Wohlrabe argues that this case law is inapplicable because the courts strictly construed the restrictions in contravention to § 202.003(a) and (2) none of the plaintiffs in those cases made the same arguments as Wohlrabe. Appellees' Br. at 36–37. This attempt to distinguish these cases falls flat. As outlined in greater detail above, Texas courts across the board strictly construe covenants that are ambiguous.

### 3. The Arizona, Arkansas, Nevada, and California cases cited by Wohlrabe are not instructive and should not be considered by this Court

Wohlrabe's reliance on cases from Arizona, Arkansas, California, and Nevada is improper. Appellees' Br. at 26–27 (citing *Price v. Kravitz,* 1 CA-CV 10-0889, 2012 WL 1380269 (Ariz. Ct. App., April 19, 2012); *Pinnacle Peak Ranchos Prop. Owners Ass'n v. Ramioulle*, 2015 WL 8475067, at *2-3 (Ariz. Ct. App. Dec. 10, 2015); *King v. Kugler*, 17 Cal. Rptr. 504 (Cal. Ct. App. 1961); *Dickstein v. Williams*, 571 P.2d 1169, 1170-71 (Nev. 1977); *Holmesley v. Walk*, 39 S.W.3d 463, 465-467 (Ark. Ct. App. 2001)).

First, Wohlrabe cited to *Price v. Kravitz*—a memorandum decision from the Arizona Court of Appeals. Appellees' Br. at 26–27; *See Calpine Constr. Fin. Co. v. Arizona Dep't of Revenue*, 211 P.3d 1228, 1233 (Ariz. Ct. App. 2009) ("The general rule for memorandum decisions is that they "shall not be regarded as precedent nor cited in *any* court."). Because *Price* is a memorandum opinion that does not refer to or cite relevant Texas law, it should have no bearing on this Court's analysis of this case. Moreover, *Price* did not hold that the phrase "not to exceed one story in height" was unambiguous. Instead, it held that the phrase "one-story in height was "sufficiently clear to permit enforcement" under Arizona's rules of construction, which explicitly reject the rule that ambiguous deed

21

restrictions are construed in favor of the free use of the land. *Price*, 2012 WL 1380269, at *2. In Texas, ambiguous deed restriction *are* construed strictly against the party seeking to enforce them and in favor of the free and unrestricted use of the land. *See e.g., See Pilarcik*, 966 S.W.2d at 478–480.

The Arkansas case similarly does not support Wohlrabe's position because the deed restriction in that case stated, "No two-story dwelling shall be constructed" on the property. *Holmesley*, 39 S.W.3d at 465. The term "two-story dwelling" is much less ambiguous than the deed restriction at issue in this case, which prohibits the building of a home more than "one-story *in height*." *Id.*

Finally, even though the California and Nevada cases cited by Wohlrabe might indicate some disharmony over the issue of deed restrictions like the one at issue in this case, there are two significant facts regarding this split of authorities. First, the cases supporting Wohlrabe's position are older, while the more recent cases that were rendered post *Johnson v. Linton* support BCH's position. Second, and more importantly, *this Court* has held that a similar phrase—"not to exceed one-half story in height"—to be ambiguous as a matter of law. *Johnson*, 491 S.W.2d at 106–

22

197. This Court should reaffirm its holding in *Johnson* and hold that the deed restriction at issue in this case is ambiguous as a matter of law.

## C. The evidence in the summary judgment record demonstrates the ambiguity of the phrase "one story in height"

### 1. BCH did not waive its argument that its proposed habitable attic was not a second story

BCH has argued vehemently from the very beginning that the home it wishes to construct did not violate the covenants because the home was not a two-story home, nor did it exceed one-story in height. However, Wohlrabe contends that BCH waived its argument that its proposed building plans did not depict a second story under the commonly accepted meaning of the term in the 1950s, when the covenants were promulgated. Appellees' Br. at 41. This is wrong. While BCH did argue that the 2012 IRC definitions were instructive, BCH did not waive its right to also argue that— even under the applicable definitions from the 1950s—BCH's proposed home was not a two-story structure. Nor did it exceed one story in height. Rather, BCH attached and cited to evidence, including affidavits and testimony from Wohlrabe, Blanchard, Shekter, and Karl Evans in which the 1950s definitions were specifically discussed. (3 SCR 72–102, 139–152, 177–78; 5 CR 4637–4688; 6 CR 5512–29, 5371–5425.) Moreover, Wohlrabe discussed these original definitions and Dallas Building Code

23

provisions in her own Motion for Summary Judgment. (4 CR 4163.) She cannot now claim that these provisions were not part of the arguments at summary judgment and preclude BCH's citation of them in this Court. Accordingly, BCH has not waived the argument that its building plans do not violate Restrictive Covenant 1 under the definitions in the 1951 Dallas Building Code.

### 2. Wohlrabe's objections to Blanchard and Shekter's affidavits are unfounded and were waived

While Wohlrabe argues that Blanchard's testimony via his Amended Affidavit was inadmissible because his Amended Affidavit was unsigned and unsworn, Blanchard's original Affidavit (attached to BCH's preliminary response to Wohlrabe's Motion for Summary Judgment) *was* signed and sworn. (3 SCR 72–102.) Blanchard's original Affidavit and Amended Affidavit contain most of the same testimony, and Blanchard's original Affidavit was incorporated by reference into BCH's amended summary judgment response. (*Id.*; 6 CR 5423, 5426–5449.) Accordingly, Wohlrabe's objection on this ground is unfounded and irrelevant to the determination of this appeal.

Reasserting the arguments made in her written objection filed with the trial court, Wohlrabe further argues that the affidavits of Blanchard and Shekter were inadmissible because they were conclusory, irrelevant, and

not credible. Appellees' Br. at 43–46; (6 CR 5700–5737.) However, for a ruling on an objection to summary judgment evidence to be effective, the ruling must be reduced to writing, signed by the trial court, and entered of record. *S&I Mgmt., Inc. v. Sungju Choi*, 331 S.W.3d 849, 855 (Tex. App.—Dallas 2011, no pet.). If the objecting party does not obtain a ruling on its objections, objections as to the form of the affidavit are waived and the objected-to material is in evidence. *Id.* (stating that the following objections constitute objections as to form: that affidavit is hearsay; that affidavit of interested witness is not clear, positive, credible, and free from contradiction). Only objections that an affidavit is conclusory may be raised for the first time on appeal. *Id.* Affidavits are conclusory if they do not provide the underlying facts to support the conclusion. *Id.* at 855–86.

Wohlrabe did not obtain a written ruling from the trial court on her objections to Blanchard and Shekter's affidavits. As most of Wohlrabe's objections stem from her belief that the affidavits are not credible—or that the affidavits simply provide testimony she disagrees with—the majority of Wohlrabe's objections were waived by her failure to obtain a written ruling in the trial court. To the extent that Wohlrabe argues the affidavits were conclusory, even a cursory review of the affidavits demonstrates they were not. Blanchard's affidavit is over 25 pages long and provides a detailed

description of the facts and reasoning supporting his ultimate conclusion. (3 SCR 72–102.) Shekter's affidavit is similarly thorough. (6 CR 5512–5529.) This is a far cry from what is sufficient to label an affidavit conclusory. Accordingly, Wohlrabe's objections to Blanchard and Shekter's affidavits are meritless and have been waived for purposes of this appeal.

### 3. Conflicting expert testimony bolsters BCH's allegation that "one story in height" is susceptible to more than one interpretation

In coming to its holding in *Johnson v. Linton*—that the deed restriction prohibiting homes that exceeded "one and one-half (1-1/2) story in height" was ambiguous—this Court reasoned that the "vagueness and uncertainty of the phrases is classically illustrated by the testimony of the various experts" because each "expert in the field of architectural design had his own idea and conception of what was meant by the phrases utilized in the restrictions." *Id.* at 197. Here, just as in *Johnson*, experts for both sides put forth thoughtful, well-supported opinions regarding whether, in their opinion, a habitable attic constituted a "story" within the meaning of the restrictive covenants.

BCH's experts opined that the habitable attic depicted in BCH's building plans did not constitute a second "story" within the meaning of the restrictions. (3 SCR 72–102; 6 CR 5426-5449, 5512-5529.) Both experts

26

stated that they believed BCH's building plans were in full compliance with the restrictive covenants. (6 CR 5441-5442, 5528.) Specifically, Blanchard testified that the home BCH intends to build would have no exterior second floor plate lines, the entire roof assembly of the home sits on the ground floor plate line, and the home lacked any architecturally defined features that would be required for a home to be architecturally defined as a two-story home. (6 CR 5430.) Both Blanchard and Shekter testified that the inclusion of the phrase "ground floor area" within restriction #2 indicates that the drafters did not intend to prohibit a two-story home or a home with a habitable attic. (6 CR 5437, 5524-5525.) Conversely, Wohlrabe's expert testified that they believed that a habitable attic created a home that is more than "one-story in height" within the meaning of the covenants and that BCH's proposed building plans were thus in violation. (2 RR 25-26; 143.)

Thus, the experts on both sides of this case had their own ideas and conceptions regarding what they believed was meant by the phrase "one-story in height." (*Id.*); *cf. Johnson*, 491 S.W.2d at 197 ("[C]an we say that the questioned phrases contained in the restrictive recitations are so clear that but one reasonable meaning for each respective phrase has clearly emerged? The mere reading of the phrases themselves and the reading of

27

the testimony of the experts who attempted to define the same answers the question in the negative."). This split in expert opinions classically illustrates the ambiguity of the deed restrictions.

**4.    Testimony from Wohlrabe and Wohlrabe's expert further demonstrates the ambiguity of the phrase "one story in height"**

The ambiguity of the phrase "not to exceed one story in height" in this case is manifest by Wohlrabe's admission at the November 25, 2013 temporary injunction hearing that if BCH did not finish out the attic, and just left the exact same size attic unfinished, it would not be a violation of the restrictive covenant. (3 SCR 160–61; 166.) The ambiguity is further demonstrated in the testimony that was provided by Wohlrabe's expert, Bob Brendle, who testified at the November 7, 2013 temporary injunction hearing that if the area in dispute was totally unfinished, but the design and height were otherwise the same, the house would only be one-story and the restrictive covenants would not be violated. (2 RR 183-184.) Brendle also testified similarly in his deposition—an excerpt of which was attached to BCH's summary judgment response—that even a building that was 40 feet high could be in compliance with the restrictions if it was only one story. (3 SCR 234.) The obvious purpose of the "not to exceed one story in height" restriction is to restrict the height of the exterior of the homes within the

Addition; the restrictions were not intended to regulate how homeowners use the interior of their homes.

Accordingly, the meaning of the term "one story in height," without further definition or specification, is ambiguous. Because it is ambiguous, this Court must interpret the restrictive covenants in BCH's favor, as ambiguity must be resolved in favor of the unrestricted use of the premises. Under BCH's interpretation of the restrictive language, BCH's building plans did not violate the restrictive covenants because the phrase "one story in height" does not restrict a homeowner from building a home with a finished/habitable attic space or a second story. Accordingly, Wohlrabe was not entitled to summary judgment or a permanent injunction.

## D. Wohlrabe's subjective interpretation of the Restrictive Covenant 1 renders it meaningless

Wherever possible, a covenant should be construed to give effect to all of the provisions and to avoid rendering any provision meaningless. *Crispin v. Paragon Homes, Inc.*, 888 S.W.2d 78, 82 (Tex. App.—Houston [1st Dist.] 1994, writ denied). Wohlrabe argues that BCH's interpretation of Restrictive Covenant 1 as a "height" restriction, rather than a "story" restriction, is not reasonable because it is "nonsensical to say that the creators intended to limit the "height" of the homes but then neglected to provide a numerical height limitation." Appellees' Br. at 37. This is illogical.

29

Wohlrabe's argument that the only reasonable interpretation of the covenant as a "story restriction" renders the covenant's "in height" language superfluous and meaningless. This is in direct contradiction to the clear rule prohibiting an interpretation that renders language in covenants meaningless.

The fact that the restriction could reasonably be interpreted as either a "story" or "height" restriction leads to the only logical conclusion—that the language in Restrictive Covenant 1 is ambiguous because it is subject to more than one reasonable interpretation. Consequently, the covenant must be interpreted strictly against Wohlrabe and in favor of the free and unrestricted use of the land. That is, the covenants must be construed in line with BCH's interpretation—the practical result of which being that BCH's proposed building plans are deemed not in violation of Restrictive Covenant 1.

## II.  BCH's affirmative defenses of impossibility, waiver, estoppel, and unclean hands precluded summary judgment

### A.  The trial court erred in granting summary judgment and denying BCH's Motion to Reconsider because there was a fact issue on BCH's affirmative defense of impossibility

The restrictive covenants at issue charge the ACC with the responsibility of approving and disapproving building plans for homes

within the Addition. Part of the criteria considered by the ACC must be whether the plan complied with the restrictive covenants.

In this case, the ACC is clearly necessary for performance of BCH's obligations under Paragraphs 8-10 of the deed restrictions. Specifically, paragraphs 8, 9, and 10 of the deed restrictions provide that the ACC is the only entity that has the power to approve or disapprove of "constriction plans and specifications" based on "quality of workmanship and materials, harmony of external design with existing structures, and as to the location with respect to topography and finish grade elevation." (14 RR 304-305.) Further, in the event the ACC, or its designated representative, fails to approve or disapprove within 30 days after plans and specification have been submitted to it, or in any event, if no suit to enjoin the construction has been commenced prior to the completion thereof, approval will not be required and the covenants shall be deemed to have been fully complied with. (*Id.*) There is nothing in the deed restrictions that give any of the homeowners or the LHPOA the right to bypass or usurp the ACC's authority to approve or disapprove of "construction plans and specifications."

All members of the ACC are deceased and, at the time BCH completed its building plans, there was no ACC in existence for BCH to submit its plans to, as required by the restrictive covenants. (8 CR 6662-6664.) That

31

is, it was impossible for BCH to obtain approval, as required by the deed restrictions. Accordingly, the doctrine of impossibility excused BCH from obtaining approval. Further, even if it were possible for BCH to get approval, the plans were deemed approved because they were sent to the listed members of the ACC and no response was received.

Because the restrictive covenants were impossible to comply with, the trial court erred in granting summary judgment and denying BCH's Motion to Reconsider.

**B.    The trial court erred in granting summary judgment as to BCH's waiver defense**

In order to establish the affirmative defense of waiver in a deed restriction case, the nonconforming user must prove that violations then-existing are so great as to lead the mind of an "average man" to reasonably conclude that the restriction in question has been abandoned and its enforcement waived. *New Jerusalem Baptist Church, Inc. v. City of Houston*, 598 S.W.2d 666, 669 (Tex. App.—Houston 1980, no writ). Among the factors to be considered by the "average man" are the number, nature, and severity of the then-existing violations, any prior acts of enforcement of the restriction, and whether it is still possible to realize to a substantial degree the benefits intended through the covenant. *Id.*

32

The majority of Wohlrabe's argument as to BCH's waiver defense is that only one other house in the Addition violated Restrictive Covenant 1's prohibition on two-story homes. However, the ratio of violations to lots within a subdivision is only one factor courts consider when determining whether the then-existing violations were so great, such as to support waiver. *New Jerusalem Baptist Church, Inc.*, 598 S.W.2d at 669 (listing other factors such as nature and severity of then-existing violations). Even a single violation can constitute waiver if it is sufficiently severe as to lead an "average man" to reasonable conclude that the restriction in question has been abandoned. *See generally id.*

There is a full two-story home at 6144 Monticello—which is the lot that sits directly next to the lot owned by BCH at 6148 Monticello, where the proposed home was to be built. (3 RR 109–110; 5 CR 4218.) The home at 6144 Monticello measures 30.90 feet in height, which is 5 ½ feet higher than the home BCH proposed to build on the neighboring lot. (6 CR 5426–5439, 5490–5494, 5512–5529.) In further contrast to the home proposed in BCH's building plans, the two-story house at 6144 Monticello has gabled windows on the front of the house in the roof, a second story exterior plate line, and second story windows that are clearly seen from the exterior of the home. (6 CR 5426–5439, 5490–5494, 5512–5529.)

33

The second floor addition and second floor plate lines at 6144 Monticello are far more significant and substantial than the alleged breach presented by BCH's building plans. That is, the impact of the full second story at 6144 Monticello on the neighborhood was far greater than any impact that could result from BCH's proposed building plans. On this basis alone, waiver is supported.

**C.      The trial court erred in granting summary judgment as to BCH's estoppel defense**

Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken. *Cimarron Country Prop. Owners Ass'n v. Keen*, 117 S.W.3d 509, 511 (Tex. App.—Beaumont 2003, no pet.). The doctrine applies when it would be unconscionable to allow a party to maintain a position inconsistent with one to which the party acquiesced, *or from which the party accepted a benefit. Id.* (citing *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000)). Stated another way, the doctrine of quasi-estoppel precludes a party, with knowledge of the facts, from taking a position inconsistent with his or her former position to the disadvantage of another. *See Stimpson v. Plano Indep. School Dist.*, 743 S.W.2d 944, 946 (Tex. App.—Dallas 1987, writ denied). Unlike equitable estoppel, quasi-estoppel requires no showing of a false representation or detrimental reliance. *See*

34

*Stimpson*, 743 S.W.2d at 946; *El Paso Nat'l Bank v. Southwest Numismatic Inv. Grp., Ltd.*, 548 S.W.2d 942, 948 (Tex. Civ. App.—El Paso 1977, no writ.).

Wohlrabe claims because there is no evidence that any of the homeowners "knew" about the restrictions, the elements of quasi-estoppel cannot be met. However, actual knowledge is not required for a finding of estoppel. Rather, the knowledge requirement is met by a showing of constructive knowledge. *See e.g., Nash v. Beckett*, 365 S.W.3d 131, 143–44 (Tex. App.—Texarkana 2012, pet. denied). Thus, because subsequent grantees are charged with constructive knowledge of restrictive covenants on their properties when those covenants are on file in the county deed records, the property owners in the Addition here had constructive knowledge of Restrictive Covenant 1. *See Musgrave v. Brookhaven Lake Property Owners Ass'n*, 990 S.W.2d 386 (Tex. App.—Texarkana 1999, pet. denied).

The homeowners within the Addition permitted violations of the restrictive covenants to occur for many years without any objection and most, if not all, of the homeowners admittedly violated one or more deed restrictions Wohlrabe seeks to enforce. (6 CR 5442-5446; 4 RR 14.) Moreover, most of the homeowners that comprise LHPOA lived in the

35

Addition when, for example, the Stillos remodeled their home in violation of the deed restrictions and when the house at 6144 Monticello was remodeled into a full two-story home measuring 30.90 feet in height. (2 RR 109-110; 6 RR 5426-5449.) This is a prime example of the type of prior acquiescence contemplated by the doctrine of quasi-estoppel. Accordingly, the trial court erred in granting summary judgment as to BCH's estoppel defense.

**D. The trial court erred in granting summary judgment as to BCH's unclean hands defense**

Wohlrabe's argument that BCH is preclude from asserting unclean hands because the homeowners did not own the properties at the time the violations occurred is inapposite. Because real covenants run with the land, it is of no consequence to the application of the unclean hands defense that a homeowner did not own the property in question at the time the violation of the deed restrictions occurred. *See Inwood N. Homeowners Ass'n v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987). Rather, because deed restrictions run with the land, they are enforceable against a homeowner at any time, regardless of whether that homeowner owned the property at the time the violation occurred. *Id.*; *see also Fallis v. River Mountain Ranch Property Owners Ass'n. Inc.*, No. 04-09-00256-CV, 2010 WL 2679997 (Tex. App.—San Antonio July 7, 2010, no pet.) (mem. op.) (reasoning that because the

36

easement at issue was similar to a restrictive covenant, it was enforceable at any time, regardless of whether the homeowner owned the property when the violation occurred). Thus, if a party's culpability for a deed restriction violation is not dependent on the party's possession of the property at the time the violation occurred, a party cannot avoid the application of the unclean hands doctrine by acquiring a property after a violation occurs. This long-established rule is actually reflected in the deed restrictions in this case, which state that "[i]f the parties hereto, or any of them, or their *heirs or assigns* shall violate or attempt to violate any of the covenants herein, it shall be lawful for any other person or persons owning real property as hereinabove described to prosecute any proceedings at law or in equity against the person. . ." (14 RR 304.)

Several of the members comprising LHPOA have admittedly violated the deed restrictions at issue. (6 CR 5442-5446; 14 RR 97-106.) In fact, Wohlrabe herself testified at the November 25, 2013 hearing that some of the wood siding on the back of her house and garage set-back was in violation of the restrictive covenants. (4 RR 14.) Thus, the doctrine of unclean hands applies, as "[LHPOA] is guilty of the same actions of which [BCH] is accused." *See Park v. Escalera Ranch Owners' Ass'n, Inc.*, 457 S.W.3d 571, 597 (Tex. App.—Austin 2015, no pet.).

### III. The trial court abused its discretion when it denied BCH's Motion to Dissolve Due to Changed Circumstances

A party may move to modify or dissolve a temporary or permanent injunction on the grounds of changed circumstances or fundamental error. *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 580 (Tex. App.—Austin 2000). The purpose of a motion to dissolve is to provide a means to show that changed circumstances require modification or dissolution of the injunction. *Id.* Changed circumstances are conditions that either alter the status quo after the issuance of the injunction or make the injunction unnecessary or improper. *Chase Manhattan Bank v. Bowles,* 52 S.W.3d 871, 879 (Tex. App.—Waco 2001, no pet.).

It is common for deed restrictions to contain provisions providing that if building plans or specifications are not approved in writing by the ACC by a certain number of days, the plans or specifications are deemed approved by the ACC. While Wohlrabe claims the ACC does not have the power to approve plans that violate the restrictive covenants, the Texas Supreme Court has held that such provisions are recognized to be "default consequences in the event the ACC does not act swiftly enough." *Pilarcik*, 966 S.W.2d at 40, n.3.

Wohlrabe contends there were no changed circumstances to support dissolution. However, the record contains evidence that BCH *did* attempt to

seek ACC approval by mailing their building plans to the named ACC members set out in the covenants, but that BCH received no response. (8 CR 6554, 6623-6635, 6661-6664.) Thus, BCH's construction plans were deemed approved, as the 30-day window in which the ACC could disapprove closed with BCH receiving no response. (8 CR 6345-6471.) These changed circumstances rendered the permanent injunction invalid and improper due to the doctrine of deemed approval. Accordingly, the trial court abused its discretion when it denied BCH's Motion to Dissolve.

**IV. The trial court erred when it granted summary judgment as to BCH's counter claims against Wohlrabe and the other members of the LHPOA**

Even if BCH's counterclaims against Wohlrabe were barred at the time originally asserted, on January 9, 2014, Wohlrabe and the other members of the LHPOA asserted affirmative claims against BCH. (4 CR 2728–2744.) These affirmative claims sought a declaratory judgment that Wohlrabe and the other members did not violate the very deed restrictions that BCH alleged they did violate. Because Wohlrabe and the other members initiated this action for affirmative relief against Blanchard on January 9, 2014, BCH could then assert any counterclaims or cross-claim against Wohlrabe and the other members arising out of the same transaction or occurrence, so long as it did so "not later than the 30th day

after the date on which the party's answer is required." Tex. Civ. Prac. & Rem. Code § 16.069. BCH's live pleading at that time already asserted its claim for affirmative relief against Wohlrabe and the other members, and that claim for affirmative relief arose out of the very deed restriction violations that Wohlrabe and the other members' affirmative claim addressed. So, BCH's claim against Wohlrabe and the other members arose out of the same transaction or occurrence as Wohlrabe and the other members' affirmative claims against BCH. *Fallis v. River Mountain Ranch Prop. Owners Ass'n*, No. 04-09-00256-CV, 2010 WL 2679997, at *7–8 (Tex. App.—San Antonio July 7, 2010, no pet.) And it was asserted "not later than the 30th day after the date on which the party's answer was required." Thus, BCH's claims are not time barred by the statute of limitations. Tex. Civ. Prac. & Rem. Code § 16.069.

## CONCLUSION

There was no basis to grant summary judgment against BCH. The trial court erred in doing so. But the problem was deeper than simply an erroneous grant of summary judgment.

As argued extensively in a companion mandamus filed by BCH and granted by this Court, the "fix is in" in the trial court. *See In re BCH Development, LLC*, No. 05-16-01481-CV (Tex. App.—Dallas); (Apx. Tab 1,

Petition for Writ of Mandamus); *see also In re BCH Dev., LLC*, 525 S.W.3d 920 (Tex. App.—Dallas 2017) (orig. proceeding) (Apx. Tab 2). The Court should reverse the summary judgment. But absent firm guidance from this Court, the trial court is likely to find a way to grant another one.

## PRAYER

Appellant BCH Development, LLC prays that the Court:

(1)     reverse the trial court's orders granting summary judgment signed on March 27, 2014; August 27, 2014; January 21, 2015; February 24, 2015; March 9, 2015;

(2)     reverse the trial court's order denying BCH's Motion to Reconsider the granting of Wohlrabe's Motion for Summary Judgment;

(3)     reverse the trial court's order granting Wohlrabe and the LHPOA's application for permanent injunction and dissolve the permanent injunction against BCH;

(4)     reverse the trial court's orders granting summary judgment against BCH's counterclaims for breach of restrictive covenants against the 27 individual homeowners;

(5)     reverse the trial court's order denying BCH's Motion to Dissolve;

(6)     reverse the trial court's judgment as to Wohlrabe, including award of attorney's fees and costs;

(7)     award costs for prevailing on appeal and any other relief to which Appellant BCH Development, LLC is entitled.

Respectfully submitted,


/s/ Shelby G. Hall
Michael A. Yanof
State Bar No. 24003215
LENAHAN LAW, P.L.L.C.
2655 Villa Creek, Suite 204
Dallas, Texas 75234
Telephone: (214)295-1008
Facsimile: (214) 295-2664
Email: Yanof@lenahanlaw.com

Shelby G. Hall
State Bar No. 24086717
THOMPSON, COE, COUSINS & IRONS
700 N. Pearl Street, 25th Floor
Dallas, Texas  75201
Telephone: (214) 871-8200
Facsimile:  (214) 871-8209

**Attorneys for Appellant**

43

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2018, a true and correct copy of the foregoing document was served by electronic service to counsel of record.

**Attorneys for Appellees:**

David W. Elrod
Worthy W. Walker
Shackelford, Bowen, McKinley & Norton, LLP
9201 N. Central Expressway, 4th Floor
Dallas, Texas 75231
E-mail: wwalker@shackelfordlaw.net

Brian A. Farlow
Grable Martin Fulton PLLC
17766 Preston Road, Suite 106
Dallas, Texas 75252
E-mail: bfarlow@grablemartin.com


/s/Shelby G. Hall
Shelby G. Hall

**CERTIFICATE OF COMPLIANCE**

I certify that this Brief contains 7,191 words, not including the parts excluded by Tex. R. App. P. 9.4(i)(1). Accordingly, it complies with Rule 9.4(i)(2)(C).

/s/Shelby G. Hall
Shelby G. Hall

ACCEPTED
05-16-01481-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
12/16/2016 5:44:35 PM
LISA MATZ
CLERK

05-16-01481-CV

# No. _____

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
12/16/2016 5:44:35 PM
LISA MATZ
Clerk

In The

# COURT OF APPEALS

## FIFTH DISTRICT OF TEXAS
Dallas, Texas

### In Re BCH Development, LLC

Petition from Cause No. CC–13–05900–A
County Court at Law No. 1, Dallas County, Texas
Honorable D'Metria Benson, Presiding Judge

### RELATOR'S PETITION FOR WRIT OF MANDAMUS

Michael A. Yanof
State Bar No. 24003215
Email: myanof@thompsoncoe.com
Thomas A. Culpepper
State Bar No. 05215650
Email: tculpepper@thompsoncoe.com
Cassie J. Dallas
State Bar No. 24074105
Thompson, Coe, Cousins & Irons, L.L.P.
700 North Pearl St., 25th Floor
Dallas, Texas 75201
Telephone:  (214) 871-8200
Facsimile:  (214) 871-8209

Kristy Blanchard
State Bar No. 24046630
E-mail: kristy@blanchardthomas.com
Blanchard & Thomas, LLP
8150 N. Central Expressway
Suite 1600 – South Tower II
Dallas, Texas 75206
Telephone: (866) 219-6119
Facsimile: (866) 332-4228

**Counsel for Relator BCH Development, LLC**

**TAB 1**

# ABBREVIATIONS AND REFERENCES IN THE PETITION

| | |
|---|---|
| **BCH** | BCH Development, LLC, defendant in the trial court, and Relator herein. |
| **Blanchard Homes, LLC** | A former defendant in the trial court and entity related to BCH. Frank Blanchard is the managing member of BCH and Blanchard Homes. |
| **Wohlrabe or the Association** | Barbara Wohlrabe and Lakeview Heights Property Owners' Association, plaintiffs in the trial court and Real Parties in Interest herein. |
| **MR** | Mandamus Record abbreviated. Specific citation is by tab and page number. For example, citation to Mandamus Record Tab A at page 4 is by "MR Tab A at 4." |

TAB 1

## IDENTITY OF PARTIES AND COUNSEL

| | |
|---|---|
| **Relator** | BCH Development, LLC |
| **Counsel for Relator** | Michael A. Yanof (trial & appellate counsel)<br>Thomas A. Culpepper (trial counsel)<br>Cassie J. Dallas (appellate counsel)<br>Thompson Coe Cousins & Irons, L.L.P.<br>700 North Pearl St., 25th Floor<br>Dallas, Texas 75201<br>Telephone: (214) 871–8200<br><br>Kristy Blanchard (co-trial counsel)<br>Blanchard & Thomas, LLP<br>8150 N. Central Expressway<br>Suite 1600—South Tower II<br>Dallas, Texas 75206<br>Telephone: (866) 219–6119 |
| **Respondent** | The Honorable D'Metria Benson<br>George L. Allen, Sr. Courts Building<br>600 Commerce Street<br>Suite 550<br>Dallas, Texas 75202 |
| **Real Parties in Interest** | Barbara Wohlrabe and Lakeview Heights Addition Property Owners' Association |
| **Counsel for Real Parties in Interest** | David W. Elrod (trial counsel)<br>Worthy W. Walker (trial counsel)<br>Brian A. Farlow (trial counsel)<br>Barbara Wohlrabe (trial counsel)<br>Gruber Elrod Johansen Hail Shank, LLP,<br>1445 Ross Avenue<br>Suite 2500<br>Dallas, Texas 75202<br>Telephone: (214) 855–6800 |

3

TAB 1

**TABLE OF CONTENTS**

ABBREVIATIONS AND REFERENCES IN THE PETITION ....................... 2

IDENTITY OF PARTIES AND COUNSEL ..................................................... 3

INDEX OF AUTHORITIES ........................................................................... 7

STATEMENT OF THE CASE ...................................................................... 10

STATEMENT OF JURISDICTION............................................................. 11

ISSUE PRESENTED ...................................................................................12

INTRODUCTION ........................................................................................13

STATEMENT OF FACTS............................................................................19

    I.     The Trial Court Grants Wohlrabe's Declaratory Judgment ......19

    II.    The Jury Awards $290,000 in Reasonable Attorney's Fees ....20

    III.   The Trial Court Ignores the Jury Verdict ................................24

SUMMARY OF THE ARGUMENT............................................................24

ARGUMENT................................................................................................ 27

    I.     Mandamus relief is available and necessary to review a trial court's order granting a new trial on legally invalid grounds................................................................................... 27

        A.    Mandamus may issue to reverse a court's order granting a new trial on unstated or legally invalid grounds. ......................................................................... 27

        B.    The trial court's order granting a new trial on attorney's fees has left BCH without an adequate remedy on appeal. ......................................................... 29

    II.    Granting new trial for BCH's purportedly improper questions and argument is a legally invalid ground. ................30

4

TAB 1

A. To preserve error for evidence or argument, a party must timely object, obtain a ruling, and request an instruction to disregard, unless it is incurable. ................31

B. The trial court clearly abused its discretion in granting a new trial for purported violations of the limine orders. ................................................... 33

    1. Purported violations of the limine order on the law of block billing did not justify a new trial. .................................................................. 35

    2. Eliciting testimony regarding the unreasonableness of the hours billed did not justify a new trial. ................................................. 39

    3. Arguing a floor on attorney's fees of $150,000 in closing argument did not justify a new trial. ..... 42

C. Other jury arguments by BCH were not improper, not objected to by Wohlrabe, and not incurable. ............ 45

    1. BCH's argument that this case was a "money grab" was not improper, was not objected to by Wohlrabe, and was not incurable. ..................... 46

    2. BCH's argument questioning the formation of the homeowner's association was not improper, was not objected to by Wohlrabe, and was not incurable. ............................................. 49

    3. BCH's argument regarding the suspect nature of the fee arrangement was not improper, was not objected to by Wohlrabe, and was not incurable. ............................................................. 50

    4. BCH's argument regarding failure to segregate cannot serve as a proper basis for a new trial. ........ 52

D. The purported indiscretions by BCH in questions and argument cannot serve as the proper basis for a new trial, individually or cumulatively............................ 53

5

**TAB 1**

III. There was factually sufficient evidence to support the jury's award of attorney's fees in the amount of $290,000...... 54

    A. It is of no consequence that the amount $290,000 was not uttered specifically by a witness......................... 55

    B. The attorney's fees sought by Wohlrabe were contradicted. ................................................................ 57

CONCLUSION............................................................................ 62

PRAYER ..................................................................................... 64

CERTIFICATE OF SERVICE...................................................... 65

CERTIFICATION PURSUANT TO TEX. R. APP. P. 52.3(j)........ 66

COMPLIANCE WITH TEX. R. APP. P. 9.4(i)(2)(B) .................. 67

APPENDIX

Certification Pursuant to Texas Rule of Appellate Procedure 52.3(k)

9/21/16 Order Granting Plaintiffs' Motion for New Trial (MR Tab L)      Tab 1

6

**TAB 1**

# INDEX OF AUTHORITIES

## <u>CASES</u>

*Bishop Abbey Homes, Ltd. v. Hale*,
  No. 05–14–01137–CV, 2015 WL 9167799
  (Tex. App.—Dallas 2015, pet. denied) .................................... 44, 45, 47, 48

*Clark v. Bres*,
  217 S.W.3d 501
  (Tex. App.—Houston [14th Dist.] 2006, pet. dism'd) ........................ 46, 48

*Cullins v. Foster*,
  171 S.W.3d 521
  (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ................... 56, 57, 61

*Garcia v. Gomez*,
  319 S.W.3d 638 (Tex. 2010) ................................................................55, 57

*Goforth v. Alvey*,
  271 S.W.2d 404 (1954) ............................................................................ 45

*Hur v. City of Mesquite*,
  893 S.W.2d 227 (Tex. App.—Amarillo 1995, writ denied) ............31, 32, 33

*In re Cerberus Capital Mgmt. L.P.*,
  164 S.W.3d 379 (Tex. 2005)..................................................................29

*In re City of Houston*,
  418 S.W.3d 388
  (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding) ......................... 34

*In re Columbia Med. Ctr. of Las Colinas, Sub., L.P.*,
  290 S.W.3d 204 (Tex. 2009) (orig. proceeding)..................... 27, 28, 29, 30

*In re Reece*,
  341 S.W.3d 360 (Tex. 2011) ................................................................. 29

*In re Toyota Motor Sales, U.S.A, Inc.*,
  407 S.W.3d 746 (Tex. 2013) (orig. proceeding) ...................................... 28

**TAB 1**

*In re Wyatt Field Serv. Co.,*
 454 S.W.3d 145
 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding) .......... 29, 33, 34

*In re Zimmer, Inc.,*
 451 S.W.3d 893 (Tex. App.—Dallas 2014, orig. proceeding) ...................28

*Living Ctrs. of Tex., Inc. v. Penalver,*
 256 S.W.3d 678 (Tex. 2008) ...............................................................32

*Lone Star Ford, Inc. v. Carter,*
 848 S.W.2d 850 (Tex. App.—Houston [14th Dist.] 1993, no writ) .......... 31

*Nat. Un. Fire Ins. v. Kwiatkowski,*
 915 S.W.2d 662 (Tex. App.—Houston [14th Dist.] 1996, no writ) ...........33

*One Call Sys. v. Houston Lighting & Power,*
 936 S.W.2d 673
 (Tex. App.—Houston [14th Dist.] 1996, writ denied) ............................ 31

*Ortiz v. Ford Motor Credit Co.,*
 859 S.W.2d 73 (Tex. App.—Corpus Christi 1993, writ denied).......... 32, 33

*Otis Elevator Co. v. Wood,*
 436 S.W.2d 324 (Tex. 1968) ............................................................... 45

*Phillips v. Bramlett,*
 288 S.W.3d 876 (Tex. 2009)........................................................... 45, 49

*Powell Elec. Systems, Inc. v. Hewlett Packard Co.,*
 356 S.W.3d 113 (Tex. App.—Houston [1st Dist.] no pet.) ...................55, 57

*Ragsdale v. Progressive Voters League,*
 801 S.W.2d 880 (Tex. 1990) ............................................................... 55

*S.W. Greyhound Lines v. Dickson,*
 236 S.W.2d 115 (Tex, 1951) ................................................................46

*Scott v. Monsanto Co.,*
 868 F.2d 786 (5th Cir. 1989) ..............................................................28

8

**TAB 1**

*State Bar of Tex. v. Evans,*
  774 S.W.2d 656 (Tex. 1989) ................................................................ 32

## STATUTES

Texas Government Code § 22.221(b)(1) ....................................................... 11

## OTHER AUTHORITIES

Tex. Const. art. I, § 15 .................................................................. 13

9

**TAB 1**

# STATEMENT OF THE CASE

**The Underlying Proceeding:** The underlying case is a declaratory judgment action involving deed restrictions in a neighborhood. (MR Tab B at 4–10.) BCH is a homebuilder seeking to build a home in the neighborhood. The mandamus stems solely from a jury trial on attorney's fees. Specifically, the trial court granted summary judgment on Wohlrabe's declaratory judgment. (MR Tab D at 4–5.) A jury trial ensued on attorney's fees. The jury awarded $290,000 to Wohlrabe in reasonable attorney's fees. (MR Tab I at 3.)

**The Respondent:** D'Metria Benson, Presiding Judge, County Court at Law No. 1, Dallas County, Texas.

**Respondent's Actions:** The trial court ignored the jury's verdict on attorney's fees, instead granting Wohlrabe's Motion for New Trial. (MR Tab L at 6; Apx. 1 at 6.)

**Relief Sought:** Relator seeks an order reversing the order granting a new trial, and either rendering judgment on the jury verdict or ordering the trial court to do so.

10

TAB 1

## STATEMENT OF JURISDICTION

This Petition for Writ of Mandamus arises out of an order signed by Judge D'Metria Benson, the presiding judge of County Court at Law No. 1, Dallas County, Texas. (MR Tab L at 6; Apx. 1 at 6.) Accordingly, the Court has jurisdiction pursuant to Texas Government Code § 22.221(b)(1).

**TAB 1**

## ISSUE PRESENTED

I. An order granting a new trial must articulate reasons in support that are specific and legally correct. Here, the stated bases in the trial court's order granting new trial are summarized as (a) BCH violated limine orders in its questions to witnesses, (b) BCH made improper jury arguments in closing argument, and (c) the evidence was factually insufficient to support the jury's award of $290,000 in attorney's fees. **Did the trial court clearly abuse its discretion in granting a new trial, leaving BCH without an adequate remedy by appeal, when:**

   a. the purported limine violations were not violations or improper at all, were not objected to with a request for an instruction to disregard or motion for mistrial, or were not incurable such that no objection was necessary;

   b. BCH's jury arguments, made in large part without any objection from Wohlrabe, were based on inferences drawn from the evidence, and at no time did Wohlrabe request an instruction to disregard or move for mistrial; and

   c. there was factually sufficient evidence contradicting Wohlrabe's claim that $579,000 was a reasonable attorney's fees for the work done on the declaratory judgment claim, and that $290,000 was within the range of a reasonable attorney's fees for the work?

12

TAB 1

# INTRODUCTION

## *Equal justice under law.*
## Supreme Court Building—Supreme Court of the United States

As long as the United States Supreme Court has sat in its own building, these words have served as a beacon over the entrance. The phrase, based in the 14th Amendment to the United States Constitution, guarantees this inalienable right to all litigants.

This short phrase is actually two guarantees. First, "equal justice" seeks to guarantee that no one, in any court, is given preferential treatment. Not based on wealth. Or race. Or status. Or a judge's affection for the lawyers on one side.

Second, "under law" means subjective notions of fairness do not trump established legal principles. In other words, a judge cannot pick the winner despite the law compelling a different result.

## *The right of trial by jury shall remain inviolate.*
## Tex. Const. art. I, § 15

Contrary to equal justice under law, the judge in County Court at Law No. 1 in Dallas County has administered—throughout the pendency of the underlying case—unequal justice above the law. Unequal because the judge has played favorites towards one party and her lawyers. Above the law because the judge's preference for one side has trumped legal principles.

13

TAB 1

This mandamus does not intend to point out all examples of unequal justice above the law. It will focus only on one: the trial court's granting of a new trial on attorney's fees as a result of the jury's failure to award as much money as the favored party and her attorneys asked the jury to award. This jury trial occurred after the trial court granted summary judgment on the favored party's declaratory judgment claims in a deed restriction case. As there were no actual damages claimed, the only issue for jury trial—before an appeal on the declaratory judgment claims—was attorney's fees. During pre-trial, the trial court severely hamstrung the disfavored party by limiting the matters on which its attorney's fees' expert could testify in refuting the favored party's claim for attorney's fees.

Given the trial court's affection for the favored party, the disfavored party assumed that every single ruling—discretionary or otherwise—would go against it at trial. This would prove to be a correct assumption. But the disfavored party nevertheless took solace in trying the attorney's fees claim to a jury, for at least four reasons.

*First*, the disfavored party would finally be in front of a jury, who could administer equal justice under law, without playing favorites.

*Second*, the favored party was not seeking actual damages yet was seeking almost $600,000 in attorney's fees. Who was the client who had

14

**TAB 1**

incurred these fees? A lawyer at the law firm representing the favored party. The lawyer is the client, and the client is the lawyer. Further, the "client" and "attorney" had a contingency fee agreement, despite this incestuous relationship and no actual damages.

Given this arrangement and the exorbitant fees sought, the disfavored party liked its chances in arguing this claim for attorney's fees was nothing more than a fee-generating mechanism for the law firm. A "lawyer money grab," if you will.

*Third*, the disfavored party liked it chances cross-examining the favored party's attorney's fees' expert—an attorney at the law firm where the client/lawyer worked. The disfavored party believed they had numerous cross-examination points—from failing to segregate fees, to block billing (which prevented the jury from determining recoverable and reasonable fees), to the inexperience of the favored party's attorneys in handling deed restriction cases.

*Fourth*, the disfavored party had its own attorney's fees expert. He was an experienced deed restriction lawyer. He had represented the disfavored party in the case. He could speak to handling a deed restriction case and what fees would reasonably be expected to be incurred in a typical, even contentious, case. The disfavored party would present this as a

15

TAB 1

suggested floor on attorney's fees, leaving the amount to be awarded up to the jury.

With this in mind, the claim for attorney's fees proceeded to a jury trial. The disfavored party was correct in its assumption—every single ruling of substance went against it. But the four above-noted reasons and strategies gave it hope that the jury would reduce the fees sought by the favored party.

And this is precisely what happened. A thoughtful jury paid attention to all the evidence in awarding attorney's fees. The jury apparently listened to the relationship between the favored party as the client and as the lawyer in the case, and the favored party's attorney's fees expert as the client/lawyer's boss. The favored party's expert on attorney's fees also reported he was the boss of the favored party's lead lawyer and that the lead lawyer answered to him in the case. The jury apparently also listened to cross-examination of the favored party's attorney's fees expert on the aforementioned matters. And the jury heard from the disfavored party's attorney's fees' expert, who testified what should reasonably be incurred in terms of hours spent by lawyers in prosecuting a typical, albeit contentious, deed restriction case. Finally, the jury apparently listened to closing

16

**TAB 1**

arguments, in which the disfavored party argued that this arrangement and the attorney's fees sought reflected a "lawyer money grab."

What did the jury do with this evidence? Essentially it awarded attorney's fees in an amount in between what the favored party advocated, and what the disfavored party asked that it consider. More than the floor. Less than the ceiling. The jury awarded $290,000, to be precise.

### *Injustice anywhere is a threat to justice everywhere.*
### Martin Luther King, Jr.

All that appeared to be left after the jury's verdict on attorney's fees was entering judgment. The claims for declaratory relief were already decided—in favor of the favored party—on summary judgment. Once a judgment was entered on the jury verdict on attorney's fees, the parties could appeal as they saw fit, on all issues ranging from the declaratory judgment to attorney's fees.

The disfavored party filed a motion for entry of judgment simply seeking entry of judgment on the jury verdict. The favored party sought a judgment notwithstanding the verdict, or alternatively a new trial, arguing that the jury didn't award enough in attorney's fees.

The trial court heard these motions together, taking them under advisement. By order entered September 21, 2016, the trial court granted

17

**TAB 1**

the favored party's motion for new trial. The order granting a new trial on attorney's fees can be summarized as stating three (albeit improper) grounds.

*First,* the disfavored party supposedly elicited testimony on a lowered amount of attorney's fees that was not allowed based on the court's rulings throughout trial against the disfavored party.

*Second,* the disfavored party apparently engaged in improper jury argument by arguing that the claim for attorney's fees was a "lawyer money grab."

*Third,* the jury wasn't told an exact number that should be the floor on attorney's fees, and thus was required to award the ceiling. Related, the jury never heard the actual amount it awarded, $290,000, and thus could not award this amount.

The order granting new trial is long. Many "indiscretions" noted in it were not objected to by the favored party during trial—including the "lawyer money grab" jury argument. Others reflect proper lines of questioning and argument in a case where attorney's fees are sought, particularly when approximately $580,000 is sought in fees, the attorney and the client are the same, and there are no actual damages. Finally, at no

18

TAB 1

time did the favored party seek a mistrial for these or any other supposed indiscretions.

More fundamentally, none of these stated reasons is a proper ground for granting a new trial. The trial court clearly abused its discretion in granting a new trial on attorney's fees. The court improperly stripped the jury of its duty in faithfully rendering a verdict.

In granting a new trial, the trial court ignored equal justice under law. Instead, it carried out unequal justice above the law. The court's favoritism and outcome-determinative approach—all the while stripping the jury of its verdict on the fact-driven claim of attorney's fees—should not stand.

This Court should reverse and render judgment on attorney's fees consistent with the jury's verdict. Alternatively, the Court should reverse and instruct the trial court to do so.

## STATEMENT OF FACTS

### I. The Trial Court Grants Wohlrabe's Declaratory Judgment

The underlying case is a deed restriction case. (MR Tab B at 4–10.) Wohlrabe—acting as both a plaintiff and an attorney in the case—created the Association and brought suit against BCH and Blanchard Homes, LLC. (MR Tab B at 18; MR Tab N at 126.) She sought to enforce a deed

19

**TAB 1**

restriction that prohibited building a house with more than one story. (MR Tab B at 4–5.)

The case has lingered in the trial court since October 13, 2013. (MR Tab A at 1.) Eventually, Wohlrabe sought a summary judgment on the declaratory judgment. (MR Tab C at 11.) The trial court granted Wohlrabe's motions for summary judgment, including granting a permanent injunction that prevented BCH and Blanchard Homes, LLC from building the home in the neighborhood. (MR Tab D at 4–5.) This endeavor by Wohlrabe—creating a homeowners' association and seeking a declaratory judgment on the deed restrictions—apparently ran up attorney's fees at her law firm of almost $580,000. (MR Tab M at 58–89; MR Tab N at 182.)

Wohlrabe also originally asserted a claim for tortious interference. (MR Tab B at 19.) But this is not a claim for which attorney's fees was available. Wohlrabe abandoned this claim before the jury trial on attorney's fees. Wohlrabe also nonsuited Blanchard Homes, LLC shortly before the trial on attorney's fees. (MR Tab E at 2; MR Tab F at 1–2.).

## II.  The Jury Awards $290,000 in Reasonable Attorney's Fees

Sometime after obtaining summary judgment, Wohlrabe proceeded to a jury trial on attorney's fees. David Elrod was designated as Wohlrabe's expert on attorney's fees. (MR Tab H at 2.) Travis Kitchens was designated

20

TAB 1

as BCH's expert to refute Elrod's testimony and address the reasonableness of the fees sought by Wohlrabe. (MR Tab G at 20.)

Elrod is the boss of Wohlrabe and supervises Brian Farlow, lead trial counsel for the Association. (MR Tab N at 14.) He testified that his firm—despite seeking no actual damages—had a contingency fee agreement with Wohlrabe, the client/attorney. (MR Tab M at 43.) From this arrangement, Elrod testified that $579,954.45 were attorney's fees attributable to the declaratory judgment claims. (MR Tab M at 91; MR Tab N at 183.) He further testified that segregated amounts were already taken out of this amount. (MR Tab M at 38-39, 43-44, 89-94.) Elrod further stated that the fees were reasonable in light of the extensive work that had been put into the case. (MR Tab N at 79.)

On cross-examination Elrod admitted that he had never before taken a homeowners' case on a contingency fee basis. (MR Tab M at 103.) BCH further established that Elrod did not specialize in homeowners' association cases, having handled only one of them before. (MR Tab M at 103.) The cross-examination also involved going through numerous time entries which were so heavily redacted and block billed that it could not reasonably be determined (1) whether entries related to the claim for which fees were

21

**TAB 1**

recoverable, and (2) whether tasks and time spent were reasonable. (MR Tab M at 121–26.)

In BCH's case-in-chief, Travis Kitchens testified. (MR N at 54.) Drawing on the experience gained from handling over two hundred homeowners' cases, Kitchens testified that the billing method and extensive redactions by Wohlrabe's law firm made it nearly impossible to determine whether the fees had been properly segregated. (MR Tab N at 115.) Kitchens also testified that Wohlrabe's extended delay in filing her motion for summary judgment, in which Wohlrabe ultimately prevailed, led to a significant amount of additional, unnecessary work and fees. (MR Tab N at 95–96.) In this regard, Kitchens went through the docket sheet and noted a one-year delay from when summary judgment could have been sought and when summary judgment was sought and granted. (MR Tab N at 79.) The attorney's fees during this one-year delay were $361,000. (*See* MR Tab N at 79; MR Tab O at 1–3.) Subtracted from $579,954.45, this "floor" would be $218,117.95. For these and other reasons, Kitchens testified that in his opinion the fees sought by Wohlrabe were unreasonable. (MR Tab N at 154.)

But he didn't stop there. He also testified that there is a typical and reasonable manner in which a deed restriction case, in his vast experience,

22

**TAB 1**

should be handled. (MR Tab N at 58–105.) Going through task by task, he explained a range of hours it should take to handle this type of case, even if contentious like this one. (MR Tab N at 97–105.) The outer limit of this range totaled 620 hours. (*Id.*) Using the billable rate of Wohlrabe's lead trial counsel, this outer limit would result in a "floor" of $170,500. (*See* MR Tab M at 46.) Using the lower limit of the range would result in a much lower amount more in the range of $150,000. (MR Tab M at 46; MR Tab N at 97–105.)

After all evidence, the parties presented closing arguments. (MR Tab N at 176–198.) Wohlrabe advocated for an award of $579,954.45. (MR Tab N at 177.)

BCH argued that the fees sought by Wohlrabe and her law firm constituted a "lawyer money grab." (MR Tab N at 186.) BCH then advocated for a lower amount, either as low as the floors or by reducing the ceiling advocated by Wohlrabe. (*See* MR Tab N at 192.) Counsel for Wohlrabe objected repeatedly to BCH's arguments, and every objection was sustained—even when no basis for the objection was stated. (MR Tab N at 186–93.) Notably, though, counsel for Wohlrabe did not object to the money grab argument. (MR Tab N at 186–87.) Also, at no time during closing argument did Wohlrabe request an instruction to the jury to

23

**TAB 1**

disregard or move for a mistrial. (*See* MR Tab N at 186–93.) In fact, at no time throughout the trial did Wohlrabe move for a mistrial, despite the numerous claimed indiscretions by BCH.

After closing arguments, the jury deliberated. The jury rendered a verdict that awarded Wohlrabe $290,000 in reasonable attorney's fees. (MR Tab Tab I at 3.)

## III. The Trial Court Ignores the Jury Verdict

The trial court ignored the jury's verdict, granting a new trial for Wohlrabe on attorney's fees. (MR Tab L at 6; Apx. 1 at 6.) In its order, the court advocated that violations of the court's limine order and part of BCH's jury argument were improper, incurable, and likely led to an improper verdict. (MR Tab L at 5; Apx. 1 at 5.) The order further stated that the evidence was factually insufficient for the jury to only award $290,000. (MR Tab L at 5; Apx. 1 at 5.)

## SUMMARY OF THE ARGUMENT

When a trial court grants a new trial on legally invalid grounds, courts of appeals may conduct a "merits review" of the correctness of the new trial order. Here, the trial court granted Wohlrabe's motion for new trial, stating that violations of the court's limine orders and improper jury arguments likely led to the rendition of an improper judgment. The court

24

**TAB 1**

also stated that a new trial was appropriate because the evidence was factually insufficient to support the jury's verdict. These grounds, individually or collectively, are legally incorrect and do not support properly granting a new trial.

As to the limine orders, purported violations were not valid grounds for the grant of new trial because a limine violation alone is inadequate to support the drastic act of throwing out a jury's verdict. Further, it is questionable at best that BCH even violated the limine orders, as the trial court's erratic rulings were inconsistent and outside the orders' parameters. But even assuming BCH violated the court's limine orders, the violations were curable, and Wohlrabe failed to preserve error by properly objecting, requesting an instruction to disregard, and seeking a mistrial.

As to the jury arguments made by BCH, they similarly cannot serve as a proper basis for a new trial because they were neither improper nor incurable. In contrast, BCH's arguments were based on inferences properly drawn from the evidence. Moreover, the arguments were not sufficiently outrageous to constitute incurable error. Wohlrabe failed to object to all but one of these arguments, and did not request an instruction to disgreard or move for mistrial as to any of them. Thus, error was not preserved as to any of BCH's jury arguments.

25

**TAB 1**

Finally, the evidence was factually sufficient to support the jury's verdict. Specifically, BCH presented factually sufficient evidence that the fees sought by Wohlrabe were unreasonable. BCH did so by cross-examining Wohlrabe's expert on attorney's fees. It also did so by presenting testimony from its own expert on attorney's fees, from which two methods to calculate a floor on attorney's fees were presented to the jury. From this evidence, the jury could (1) award Wohlrabe the fees sought; (2) reduce these fees sought; (3) award one of the "floor" amounts; or (4) award fees in between the ceiling and the floor. The jury chose option four, and acted within its purview in doing so.

The trial court clearly abused its discretion in granting a new trial because the court failed to articulate any legally valid ground supporting a grant of new trial. Accordingly, this Court should reverse the trial court's order and reinstate the jury's verdict.

26

TAB 1

**ARGUMENT**

I. **Mandamus relief is available and necessary to review a trial court's order granting a new trial on legally invalid grounds.**

    A. **Mandamus may issue to reverse a court's order granting a new trial on unstated or legally invalid grounds.**

Trial courts used to have broad discretion to grant new trials for virtually any or no stated reason. Stated another way, the trial court was not required to state a reason for granting new trial, much less a legally sound reason.

This broad discretion, however, was restricted by the Texas Supreme Court in 2009. *See In re Columbia Med. Ctr. of Las Colinas, Sub., L.P.*, 290 S.W.3d 204, 210, 213 (Tex. 2009) (orig. proceeding). The Court in *Columbia* held that a trial court abuses its discretion by granting a motion for new trial without providing a reasonably specific reason for setting aside the jury's verdict. *Id.* ("The trial court's action in failing to give its reasons for disregarding the jury's verdict as to Columbia was arbitrary and an abuse of discretion.").

Four years later, the Texas Supreme Court further expanded mandamus review of orders granting new trials in holding that an appellate court may conduct a "merits review" of the correctness of a new trial order. *In re Toyota Motor Sales, U.S.A, Inc.*, 407 S.W.3d 746, 757–59 (Tex. 2013)

27

**TAB 1**

(orig. proceeding) (stating that a new trial order cannot stand if the court's articulated reasons are not supported by the underlying record). The Court reasoned that "[s]imply articulating understandable, reasonably specific, and legally appropriate reasons is not enough: the reasons must be valid and correct." *Id.* at 759.

Requiring increased specificity and legal correctness protects a litigant's right to a jury trial by ensuring a trial judge cannot set aside a verdict simply because the judge sees the evidence differently. *Columbia*, 290 S.W.3d at 212 (quoting *Scott v. Monsanto Co.*, 868 F.2d 786, 791 (5th Cir. 1989) (stating that "a trial court's discretion in granting a new trial is not 'impenetrable' and that 'careful scrutiny given to orders of new trials is intended to assure that the court does not simply substitute [its] judgment for that of the jury.'")). It also protects against a rogue judge playing favorites and showing outcome-determinative preferences to one side by giving a litigant multiple bites at the apple with unjustified new trials.

Since *Columbia* and *Toyota*, appellate courts—including this Court—have granted mandamus relief in reversing trial court orders granting new trials on unspecified or legally invalid grounds. *See, e.g.*, *In re Zimmer, Inc.*, 451 S.W.3d 893, 900 (Tex. App.—Dallas 2014, orig. proceeding); *In re*

28

**TAB 1**

*Wyatt Field Serv. Co.*, 454 S.W.3d 145, 149 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding).

### B. The trial court's order granting a new trial on attorney's fees has left BCH without an adequate remedy on appeal.

The two requisites for obtaining mandamus relief for an improper grant of new trial are the same as for any mandamus: (1) the trial court clearly abused its discretion and (2) there is no adequate remedy by appeal. *In re Reece*, 341 S.W.3d 360, 364 (Tex. 2011). A trial court clearly abuses its discretion when its decision is so arbitrary and unreasonable as to amount to a clear and prejudicial error of law, or if it fails to analyze or apply the law correctly. *See In re Cerberus Capital Mgmt. L.P.*, 164 S.W.3d 379, 382 (Tex. 2005). Here, the trial court clearly abused its discretion when it granted Wohlrabe's Motion for New Trial on legally invalid grounds.

As to the second element, the long-established rule in Texas—that an order granting a motion for new trial generally is not subject to appellate review—ended with *Columbia* and *Toyota*. *See Columbia*, 290 S.W.3d at 209 (reasoning that absent mandamus review, Columbia would have no appellate review of the order granting new trial). Now, a litigant lacks an adequate remedy by appeal when the order granting new trial either

29

TAB 1

(1) does not state the reasons or (2) states legally or factually invalid reasons. *Id.*

The latter basis leaves BCH with no adequate remedy by appeal here. Also, affording Wohlrabe a new trial on attorney's fees would provide her two bites at the apple, on grounds that were legally invalid.

## II.    Granting new trial for BCH's purportedly improper questions and argument is a legally invalid ground.

In its order granting new trial, the trial court documented a laundry list of supposed instances in which BCH violated the court's supplemental limine order and made improper jury arguments. For example, the court said BCH violated the trial court's limine order by presenting testimony and argument regarding (1) the number of hours BCH's expert believed would have been reasonable and (2) BCH's assertions that $150,000.00 was a reasonable attorney's fee.

The court further noted that certain parts of BCH's jury argument caused incurable harm, including argument that: (1) the case was about a "lawyer money grab"; (2) attacked the creation of an association by some property owners; (3) criticized counsel for the Association's use of block billing as preventing scrutiny of the billing entries; and (4) counsel for the Association's failure to segregate entries related to a cause of action that was dropped (and for which attorney's fees were not recoverable).

30

**TAB 1**

Each of these grounds is legally invalid and cannot support the proper grant of new trial for three reasons. First, BCH did not violate the limine order. Second, most of the purportedly improper jury arguments were not objected to and were not incurable. Third, for those jury arguments that were objected to, no mistrial was sought, and these arguments were not incurable.

### A. To preserve error for evidence or argument, a party must timely object, obtain a ruling, and request an instruction to disregard, unless it is incurable.

When improper testimony or argument reaches the jury, the party opposing the evidence or argument generally must object and obtain a ruling. *One Call Sys. v. Houston Lighting & Power*, 936 S.W.2d 673, 677 (Tex. App.—Houston [14th Dist.] 1996, writ denied); *Hur v. City of Mesquite*, 893 S.W.2d 227, 231 (Tex. App.—Amarillo 1995, writ denied). To pursue a ruling, a party must first make a proper and specific objection to the evidence or argument presented. If the court overrules the objection, the error is preserved and no further action need be taken. *Lone Star Ford, Inc. v. Carter*, 848 S.W.2d 850, 854 (Tex. App.—Houston [14th Dist.] 1993, no writ).

But if the court sustains a timely objection, the objecting party must then ask the court to instruct the jury to disregard the evidence. *State Bar*

31

**TAB 1**

*of Tex. v. Evans*, 774 S.W.2d 656, 658 n. 6 (Tex. 1989). Additionally, once the court sustains the objection and instructs the jury to disregard, the party must then move for mistrial in order to later seek a new trial as a result of the improper question or argument. *See Hur*, 893 S.W.2d at 231–32; *Ortiz v. Ford Motor Credit Co.*, 859 S.W.2d 73, 77–78 (Tex. App.—Corpus Christi 1993, writ denied).

If a party fails to follow these steps, the party generally waives any objection to the error. The exception is when an improper line of questions or argument is incurable. The instances of Texas courts finding questions or argument incurable are rare. What does *not* suffice as incurable is merely violating a limine order or a rule of evidence in introducing evidence or making an argument. What *might* suffice as incurable is argument violating all bounds of decency. Instances of such incurable argument include racial attacks or comparing a party to a genocidal murderer like Hitler. *See, e.g., Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008).

In granting a new trial, the trial court cited multiple instances where allegedly improper argument and testimony were permitted to reach the jury. Notwithstanding, Wohlrabe only requested a curative instruction for one of these. Moreover, Wohlrabe did not at any time move for a mistrial. Consequently, Wohlrabe failed to preserve error as to any of the allegedly

32

TAB 1

improper testimony or jury argument, unless the arguments were incurable. *See Hur*, 893 S.W.2d at 231-32; *Ortiz*, 859 S.W.2d at 77-78. To find these arguments incurable would set a dangerously low bar for incurable arguments that no Texas court has dared approach.

**B.    The trial court clearly abused its discretion in granting a new trial for purported violations of the limine orders.**

When evidence or argument is placed before the jury in violation of a motion in limine, an instruction to disregard is generally sufficient to cure the error. *In re Wyatt Field Serv. Co.*, 454 S.W.3d 145, 161 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding). While curable violations require counsel to object and pursue an adverse ruling to preserve error (or object and request an instruction to disregard if the objection is sustained), incurable violations may serve as the basis for a new trial even if not properly preserved. *See Wyatt Field Serv. Co.*, 454 S.W.3d at 161; *Nat. Un. Fire Ins. v. Kwiatkowski*, 915 S.W.2d 662, 664–65 (Tex. App.—Houston [14th Dist.] 1996, no writ).

When conducting appellate review of the purported violation of a limine order, the appellate court will determine whether the instruction issued by the trial court was sufficient to cure the error. *In re City of Houston*, 418 S.W.3d 388, 397 (Tex. App.—Houston [1st Dist.] 2013, orig.

33

**TAB 1**

proceeding). But when a curative instruction is neither requested nor issued, a curable violation is waived and cannot serve as a proper basis for granting a new trial. *Wyatt Field Serv. Co.*, 454 S.W.3d at 161.

The trial court below issued three supplemental limine orders. The first order instructs the parties not to argue any law prohibiting block billing:

> [a]ny testimony, evidence, or argument that any law requires a party seeking to recover attorney fee statements which utilize task billing, i.e., which reflect the amount of time spent on each task performed by the attorney, paralegal, legal assistant, or any law that prohibits block billing.

(MR Tab N at 13.)

The second and third orders limit the matters over which BCH's expert was permitted to testify:

> [h]e can opine that he thinks that the amount that was disclosed is improper. . . . [H]e can also opine as to why he thinks that, but he cannot opine as to what he thinks an appropriate number would have been. . . . **He can testify to hours**, but not amounts.

(MR Tab N at 51, 53) (emphasis added.)

In its order granting new trial, the court stated that BCH made arguments and elicited testimony violating all three of these supplemental limine orders. (MR Tab L at 2; Apx. 1 at 2.) It is questionable at best that BCH violated these limine orders. But either way, Wohlrabe waived error

34

**TAB 1**

by failing to ask for a curative instruction. Nor did Wohlrabe ever move for a mistrial at any time during the trial. Even when taken cumulatively, none of the alleged violations constitute incurable error; thus, there is no basis for granting a new trial.

### 1. Purported violations of the limine order on the law of block billing did not justify a new trial.

BCH did not violate the court's supplemental limine order regarding block billing. Specifically, the supplemental order precluded BCH from ascertaining or arguing "that any law requires" the use of task billing or prohibits block billing. (MR Tab N at 13.) After the court's issuance of this order, however, the record is bereft of testimony or argument regarding any such matter.

In this regard, the following excerpts of the record comprise the entirety of the block billing testimony and argument that occurred *after* the issuance of the court's supplemental order. During the direct examination of BCH's expert witness, there were three different occasions where counsel for Wohlrabe objected to testimony regarding the impact of block billing:

> Q: (By Mr. Yanof) If you do not itemize each amount and instead simply block bill amounts, does that make it —— well, what does that do to your bill?
>
> Mr. Farlow: Objection, Your Honor. This is – –
>
> The Court: Sustained.

(MR Tab N at 63.)

*** 

Q:     So you bill each single thing you do, and then put the actual time spent next to it?

A:     Yes, sir.

Mr. Farlow:     Objection, Your Honor, relevance.

The Court:     Sustained.

(MR Tab N at 65–66.)

***

Q:     (By Mr. Yanof)     In looking through these bills, Mr. Kitchens, can you figure out whether any of the research done was devoted to the tortious interference claim, a claim on which plaintiffs could not recover attorneys' fees?

A:     For the most part, no. If you look at Exhibit 4, the first page, there's four entries. And on the next page there's another entry for legal fee. And ——

Q:     This is the first page of Exhibit 4 – –

A:     Yes, sir.

Q:     – – just for reference.

A:     And that doesn't tell me one way or the other what they're researching, whether it would be recoverable or not recoverable.

Mr. Farlow:     Objection, Your Honor. He's asking the question that – –

The Court:     Sustained.

36

TAB 1

(MR Tab N at 84–85.)

That these objections were sustained shows the favoritism the trial court showed to the favored party, Wohlrabe. For two of the objections, counsel did not even state the basis for the objection. For all of them, these were proper questions.

But more to the point, these questions did not ask the witness to comment on the law of task or block billing. Rather, they properly asked about the limitations that block billing places on scrutinizing bills to determine reasonable attorney's fees attributable to a recoverable claim.

A similar sequence played out in closing arguments. That is, Wohlrabe objected to jury argument addressing the implications of block or task billing:

> They bill – – if we can look at the bill, the way they did it, they chose to do this. You heard Mr. Elrod testify he could have done it either way. He could have – – he could have billed – –
>
> Mr. Farlow:    You Honor, objection. I'm sorry. This is going into the – –
>
> The Court:    Be careful, Mr. Culpepper.
>
> Mr. Culpepper:    All I'm – – my only statement is if you – – from these bills, you can't determine how much time they spent. You heard Mr. Kitchens say he sends his client itemized bills. He can't determine it. You can't – – the other expert can't segregate.
>
> Mr. Farlow:    Objection.

37

**TAB 1**

The Court:    Sustained.

(MR Tab N at 188–89.)

Again, Wohlrabe's counsel failed to state the basis for his objection. More importantly, this argument had nothing to do with "the law" of block or task billing. Instead, it simply makes the point that block billing in this manner makes it difficult to segregate recoverable fees from non-recoverable fees and to determine whether each task in a block-billed entry was reasonable. Because BCH did not violate the supplemental orders in limine, "violation" of the court's limine order regarding block billing cannot serve as a proper basis for a grant of new trial.

Yet, even if BCH violated the court's order, the violations were neither preserved nor incurable error. In its order granting new trial, the trial court stated that the testimony and argument made regarding block billing constituted incurable error. This means that, assuming BCH violated the limine order, the violations were so severe that an instruction to disregard would not have cured the violation's prejudicial effect. The testimony and argument outlined above, however, are proper, and certainly not so extreme or shocking that an instruction to disregard would not have been effective. Thus, any violation of the order regarding block billing was curable and

38

**TAB 1**

must have been properly preserved in order to serve as a legitimate basis for a grant of new trial.

Wohlrabe did not preserve error with regard to BCH's alleged violations of the court's supplemental order because no mistrial was sought. At no time during the trial—with all of the alleged indiscretions committed by BCH—did Wohlrabe move for a mistrial. In fact, the only time an instruction was requested was before day two of trial began, and before the testimony and argument at issue were presented. Accordingly, this stated basis in the order granting new trial is not substantively valid or correct and cannot support properly granting a new trial.

### 2. Eliciting testimony regarding the unreasonableness of the hours billed did not justify a new trial.

There were multiple instances in this case where BCH attempted to put on testimony that the hours billed by Wohlrabe attorneys were unreasonable. While this was not in violation of the limine order on this matter—which precluded testimony as to a dollar amount that the expert thought would be appropriate (MR Tab N at 51, 53)—the court stated in its order granting new trial that BCH had violated the order many times. The following excerpts from the record contain the entirety of the expert's testimony in question:

39

**TAB 1**

Q:    But in your experience as a 37-year lawyer handling HOA cases, do you have an opinion about whether the total amount of hours expended by the law firm representing the plaintiff's was reasonable?

A:    I have an opinion.

Q:    What is that opinion?

A:    It's unreasonable.

Q:    In your experience as a 37-year lawyer specializing in HOA cases, how many hours do you believe are reasonable in prosecuting a deed restriction case, the claim on which attorney's fees are recoverable?

Mr. Farlow:    Objection, Your Honor. That's the exact – –

The Court:    Sustained.

(MR Tab N at 89.)

***

Q:    (By Mr. Yanof)  You heard the testimony yesterday that the total amount of hours in this case by plaintiffs' counsel's firm, including plaintiff herself, is most – – who has more hours than anybody else us 2,560.50 hours. Do you recall that?

A:    That's what their exhibit shows?

Q:    Have you ever seen that many hours in a deed restriction case?

Mr. Farlow:    Objection, Your Honor.

The Court:    Sustained.

(MR Tab N at 97.)

40

TAB 1

For starters, yet again Wohlrabe's counsel did not state a basis for the objection. No matter, the trial court again sustained the objections.

More fundamentally, in asking the number of hours instead of the dollar amounts, BCH carefully complied with the trial court's supplemental limine orders (misguided as they were). (MR Tab N at 51, 53.) The trial court continually hamstrung BCH anyway, sustaining objections that did not violate the order and without a stated basis. Simply put, if the favored party asked for it, the favored party got it.

Be that as it may, at no point in these exchanges between BCH's counsel and its expert witness did counsel request, or the witness suggest, a specific dollar amount that would have been reasonable (as prohibited by the limine order). Furthermore, this testimony was directly within the parameters of the trial court's instruction that the witness may "testify as to hours, but not amounts." (MR Tab N at 51, 53.) Therefore, because there was no violation in the first place, a purported violation of this limine order cannot serve as the basis for a proper grant of a new trial.

But even if this supplemental limine order was violated, the error was curable and not properly preserved. Any error arising from these alleged violations was curable because an instruction most assuredly would have eliminated any prejudice created by the purportedly improper questions.

41

**TAB 1**

This is due in large part to the fact that the witness was not permitted to provide an answer to these questions, let alone provide a dollar amount that he deemed reasonable for this case. The alleged violations thus did not constitute incurable error.

Because any alleged error related to this particular limine order was curable, Wohlrabe's counsel was required to preserve error by pursuing an adverse ruling or if sustained, request an instruction. Wohlrabe failed to do so. Consequently, any error was waived and this ground, as outlined in the trial court's order, cannot support the trial court's grant of a new trial.

### 3. Arguing a floor on attorney's fees of $150,000 in closing argument did not justify a new trial.

In its order granting new trial, the court stated that BCH violated its pretrial rulings when it argued to the jury that $150,000 as a floor would be a reasonable attorney's fee to award. (MR Tab L at 2; Apx. 1 at 2.) The basis for this jury argument was two-fold.

*First*, BCH's expert, an experienced deed restriction lawyer, opined on the reasonable hours that should be expended in a deed restriction case—even a contentious case. (MR Tab N at 98–104.) These hours paled in comparison to those expended by Wohlrabe's law firm, that was inexperienced in handling deed restriction cases. This range of hours, using the hourly rate of Wohlrabe's law firm, totaled approximately $150,000

42

**TAB 1**

($170,500 for the high end of the range, and approximately $150,000 or less for the lower end of the range).

*Second*, BCH's expert testified that Wohlrabe's law firm should have moved the case to conclusion earlier. In direct examination of BCH's expert, he went through the court's docket and how Wohlrabe could have reasonably obtained a summary judgment on the merits about a year earlier, thereby avoiding exorbitant fees incurred by delaying. (MR Tab N at 79-80.) By eliminating the dragged-out litigation, the fees that could have been avoided would reduce the fees recoverable to a little higher floor—to $218,000.

To be clear, the jury did not go as low as these floors and award $150,000-$218,000. But it could have. Conversely, the jury did not award the fees Wohlrabe asked the jury to award: $579,954.45. Instead, the jury awarded $290,000. Less than the ceiling, more than the floor. The jury was within its discretion in doing so. More fundamentally, BCH's arguing for the floor of somewhere in the $150,000 range was proper given the evidence. No expert or document had to explicitly say the number $150,000 to properly argue it was a reasonable amount, given the testimony cited above. Rather, it was a reasonable inference drawn from

43

**TAB 1**

the testimony presented. Further, the supplemental limine order on amounts of fees addresses expert testimony, not jury argument.

But even assuming arguendo that this argument was improper and violated the trial court's limine orders, it was not properly preserved. Admittedly, Wohlrabe's counsel did object to this jury argument. Predictably, the trial court sustained the objection for the favored party.

Notwithstanding, to be a proper basis for a new trial, Wohlrabe had to request a curative instruction or move for a mistrial. *See Bishop Abbey Homes, Ltd. v. Hale*, No. 05–14–01137–CV, 2015 WL 9167799, at \*11 (Tex. App.—Dallas 2015, pet. denied) (reasoning that error as to improper argument must be preserved by proper objection and request for an instruction or mistrial, unless the argument is incurable). Because Wohlrabe did neither, error was not preserved, and the trial court could not properly order a new trial on this ground unless the argument was incurable. It is difficult to conceive how stating a dollar amount is incurable. When the dollar amount is reasonably inferred from the evidence, it certainly is not incurable (or improper, for that matter).

Simply put, granting a new trial based on suggesting $150,000 as a floor for reasonable attorney's fees is legally incorrect and does not justify the proper grant of a new trial.

### C. Other jury arguments by BCH were not improper, not objected to by Wohlrabe, and not incurable.

Improper jury argument can result in the later granting of a new trial only when it is properly objected to or incurable. *See Bishop Abbey Homes*, 2015 WL 9167799, at *11. Almost always, to preserve error an objection must be asserted because incurable jury argument is rare. *Id.* Cases finding incurable harm "typically involved unsubstantiated attacks on the integrity or veracity of a party or counsel, appeals to racial prejudice, or the like." *Otis Elevator Co. v. Wood*, 436 S.W.2d 324, 333 (Tex. 1968). Said another way, an argument is only incurable when it is "so extreme that a 'juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument.'" *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009) (quoting *Goforth v. Alvey*, 271 S.W.2d 404, 404 (1954)).

In its order granting new trial, the trial court outlined multiple instances in which BCH supposedly made improper and incurable jury arguments. Only one of these—failing to segregate—was objected to by Wohlrabe. For all others, error was not preserved unless the argument was incurable.

45

TAB 1

None of these arguments was incurable. In fact, BCH's closing argument was proper, and certainly a far cry from the sort of outrageous and extreme argument that typically underlies a finding of incurability.

### 1. BCH's argument that this case was a "money grab" was not improper, was not objected to by Wohlrabe, and was not incurable.

In its closing argument, counsel for BCH stated that "this case was about a lawyer money grab from day one." (MR Tab N at 186.) In its order granting new trial, the court stated that this argument, among others, "had the effect of striking at and harming the judicial system itself." (MR Tab L at 3; Apx. 1 at 3.) Given the nature of this case, this argument certainly was not the kind of extreme argument that classifies as "incurable."

Parties are permitted to make arguments based on inferences drawn from the evidence presented at trial. *Clark v. Bres*, 217 S.W.3d 501, 510 (Tex. App.—Houston [14th Dist.] 2006, pet. dism'd). When doing so, there is no rule against expressing even a highly unfavorable opinion of an opposing party or witness. *Id.* (citing *S.W. Greyhound Lines v. Dickson*, 236 S.W.2d 115, 118 (Tex, 1951)) (holding that party's argument that party was a "thief, liar, and a fraud" was not improper argument).

In *Bishop Abbey Homes*, this Court held that counsel's comment during closing argument regarding "the depth and breadth of the lies" told

46

**TAB 1**

by a witness was not incurable error. *Bishop Abbey Homes, Ltd.*, 2015 WL 9167799, at *13. In so holding, the Court reiterated the proposition that trial counsel is given wide latitude in making jury arguments. *Id.* Because evidence was presented at trial that the witness may have made false representations, it was not improper for counsel to argue as to the witness's truthfulness during closing argument. *Id.* This Court further held that in any event, any harm caused by the argument could have been cured by an objection and instruction by the trial court. *Id.*

Here, the sole issue at trial was how much Wohlrabe should recover in reasonable attorney's fees. Testimony was presented that Wohlrabe failed to segregate fees of the underlying declaratory judgment action from the related tort action. (MR Tab N at 80–82.) There was also testimony that Wohlrabe's delay in filing a motion for summary judgment caused fees to be driven up. (MR Tab N at 76–80.) Finally, there was testimony elicited as to the suspect nature of the contingency fee arrangement between Wohlrabe and her counsel—specifically that such an arrangement in a case with no actual damages creates an incentive to drive up fees because they are the only means of recovery for Wohlrabe's law firm. (MR Tab N at 105–07.)

TAB 1

As a result, BCH argued in closing argument that seeking approximately $580,000 in fees constituted a "lawyer money grab." (MR Tab N at 186.) Given the evidence, this was not improper jury argument. Rather, it was simply argument that admittedly was argumentative. *See Clark*, 217 S.W.3d at 510 ("'[S]uch hyperbole for emphasis is an accepted technique of oral advocacy and is part of our legal heritage and tradition.'").

But even if it was improper argument, Wohlrabe failed to object. (*See* MR Tab N at 186–87.) Just as this Court noted in *Bishop Abbey Homes*, "[a]ny error or harm occurred from counsel's use of hyperbole in his discussion could have been cured by an objection and instruction from the trial court." *Hale*, 2015 WL 9167799, at *13.

Likewise, BCH's jury argument was not improper, or at most, curable error. Consequently, Wohlrabe was required to properly preserve the error by a timely objection and request for a curative instruction. Wohlrabe did neither. Accordingly, BCH's jury argument that the case was about a "lawyer money grab" is a legally incorrect ground from which the trial court could properly grant a new trial.

48

TAB 1

## 2. BCH's argument questioning the formation of the homeowner's association was not improper, was not objected to by Wohlrabe, and was not incurable.

The trial court also found that BCH's jury argument "attacking the creation of an association" by Wohlrabe—the client and attorney at the client's law firm—was incurable jury argument warranting a new trial. (MR Tab L at 3; Apx. 1 at 3.) The following is the only mention of Wohlrabe creating the homeowner's association during BCH's closing argument: "They never needed the homeowner's association. It wasn't necessary. It was created – – an entity to go sue them and didn't need [Wohlrabe] to file their lawsuit." (MR Tab N at 187.)

This argument emphasized that the client was the attorney and drove home the point that the attorney's fees were unreasonably escalated. There is nothing improper about this (brief) argument.

Further, the argument was neither objected to by Wohlrabe nor incurable. That is, the argument was not so severe or outrageous that it could have caused the jury to "agree to a verdict contrary to that to which he would have agreed but for such argument." *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009). Therefore, any prejudice incurred by Wohlrabe—due to this brief, three-sentence-long argument—was curable by an objection and instruction from the trial court to disregard. Because

49

**TAB 1**

Wohlrabe did not object or request such an instruction, much less move for a mistrial, error was not preserved. And if error was not preserved, it could not properly serve as a ground for new trial. The trial court clearly abused its discretion in granting a new trial on this ground.

### 3. BCH's argument regarding the suspect nature of the fee arrangement was not improper, was not objected to by Wohlrabe, and was not incurable.

The trial court's order further noted that a new trial was appropriate because BCH made arguments attacking the validity of Wohlrabe's contingency fee arrangement with its counsel. The trial court thus deemed the following argument improper and incurable:

> And you heard from Mr. Elrod. He told you on the stand the contingency fee agreements are typically used because somebody can't pay. Ms. Elrod − − excuse me. Ms. Wohlrabe, according to Mr. Elrod, charges $300 an hour. So I think that she could pay that if she wanted to. Instead, they enter into a contingency fee agreement where all − − the only thing they're going to collect is attorneys' fees.
> So what are they going to do? If it settles day one, they get zero, nothing, nada. The only recovery is the longer the thing goes on and the bigger the attorneys' fees they jet up, the bigger the award potentially. That's all there is. That's all they're fighting about, attorneys' fees.

(MR Tab N at 187.)

***

> So the agreement is we discussed that contingency fee agreement. Ms. Wohlrabe is never going to have to pay any fees. The homeowners' association is never going to have to pay any fees. And, again, the only way they recover any fees is if there

50

**TAB 1**

are fees to recover. So without creating fees, you've got no recovery.

And, in fact, as both Mr. Elrod and Mr. Kitchens testified, in a contingency fee agreement, they typically share the recovery. They're not sharing any recovery with Ms. Wohlrabe or the homeowners' association with these fees.

Now, we talked about budget. Mr. Elrod said, well, by the nature of a contingency fee agreement, he was going to have to be efficient. That was his testimony. I would agree with him in a normal contingency fee agreement where there are actual damages that you're trying to recover and you're going to share in those damages because the quicker you end it, the sooner you get the recovery. And as a lawyer, you don't have to put in as much time in because the less time you put in, the bigger your recovery.

Under this contingency fee agreement, the more time he puts in, the more potential recovery for him. It's the opposite of a typical contingency fee agreement. This contingency fee agreement incentivizes the lawyer's to spend money, which is the opposite of what Mr. Elrod told you.

(MR Tab N at 189–90.)

In addition to the incestuous relationship between attorney and client, this argument is premised on two undisputed and relevant facts: there were no actual damages sought, yet Wohlrabe sought almost $580,000 in attorney's fees from a contingency fee agreement. This rendered the fee agreement an unprecedented one—a contingency fee agreement where there is no shared recovery, and where recovery requires churning up significant attorney's fees. How is pointing this out to the jury improper?

51

TAB 1

Also, this lengthy argument was not objected to by Wohlrabe. Thus, it is waived and cannot be the proper basis for a new trial, unless the argument was incurable. This argument certainly does not fit within the category of argument that is incurable.

Rather, this argument was proper, and in any event was neither objected to nor incurable. Accordingly, it was legally incorrect for the trial court to grant a new trial on this ground.

### 4. BCH's argument regarding failure to segregate cannot serve as a proper basis for a new trial.

There was one other portion of BCH's jury argument cited by the trial court in the order granting new trial. Specifically, BCH argued that Wohlrabe failed to properly segregate recoverable fees from nonrecoverable fees:

> And Mr. Elrod told you, well, I took out $25,000. If you look at the fee statements, remember he had a cause of action, one whole cause of action that he dropped, he couldn't recover attorney's fees on. And he's saying, but that was only $25,000. If you look at the fee statements, you will see that they should have segregated hundreds of thousands of dollars related to that claim. They were going to – –
>
> Mr. Farlow:    Objection, Your Honor.
>
> The Court:    Sustained.

(MR Tab N at 190–91.)

52

TAB 1

Again, that there was no stated basis for the objection did not stop the trial court from sustaining the objection. Further, the jury heard evidence that segregation of recoverable fees from non-recoverable fees was required and that these fees were not sufficiently segregated. (MR Tab N at 81.) Therefore, argument asserting that the fees were not properly segregated was proper.

But even if this argument was improper, it was curable. Thus, Wohlrabe was required to object and, if sustained, seek a curative instruction or move for a mistrial. Otherwise, error is not preserved to later seek a new trial on this basis.

Wohlrabe did neither. Instead, Wohlrabe's counsel merely objected, stating no basis for the objection, then sat down once the objection was sustained. Accordingly, any purported error as to this argument was waived, and the trial court's order granting new trial cannot be supported on this ground.

**D.    The purported indiscretions by BCH in questions and argument cannot serve as the proper basis for a new trial, individually or cumulatively.**

Not a single stated basis for granting a new trial was legally supportable. Nor did Wohlrabe properly preserve any ground by requesting a curative instruction or seeking a mistrial. Because none of the evidence or

53

TAB 1

argument was incurable, error was waived. More fundamentally, every single stated basis in the order granting new trial was proper examination or argument by BCH.

Yet Wohlrabe argues that individually and collectively, the stated bases suffice for granting a new trial. There is no legal basis in Texas jurisprudence for granting a new trial based on cumulative error when each stated reason is not improper, much less preserved for later seeking a new trial.

The stated bases for granting a new trial are not legally supportable, individually or cumulatively. Therefore, the order granting new trial on grounds of improper questioning and argument states legally invalid reasons for granting a new trial.

## III. There was factually sufficient evidence to support the jury's award of attorney's fees in the amount of $290,000.

The trial court seemed persuaded by three arguments from Wohlrabe regarding the purported factual insufficiency of the amount awarded by the jury. First, no expert uttered the number $290,000. Second, the only specific number stated by an expert was $579,954.45. Third, jury argument suggesting a floor as low as $150,000 was not supported by the evidence. None of these arguments is a proper basis for a new trial.

54

TAB 1

The determination of reasonable attorney's fees is a fact question and "'the testimony of an interested witness, such as a party to the suit, though not contradicted, does no more than raise a fact issue to be determined by the jury." *Garcia v. Gomez*, 319 S.W.3d 638, 642 (Tex. 2010). There is an exception to this rule: "where the testimony of an interested witness is not contradicted by any other witness, or attendant circumstances, and the same is clear, direct and positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it is taken as true, as a matter of law." *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990).

In other words, when a party puts on evidence that contradicts the fees sought by the plaintiff—whether by cross-examination of the plaintiff's expert or by presenting its own expert—the trier of fact is not bound to the number provided by the plaintiff's expert. *Powell Elec. Systems, Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 128 (Tex. App.—Houston [1st Dist.] no pet.).

### A.    It is of no consequence that the amount $290,000 was not uttered specifically by a witness.

In seeking a new trial, Wohlrabe argued that the "only evidence submitted in the case concerning the amount of reasonable fees for the services of Plaintiffs' attorneys through trial was the evidence and

TAB 1

testimony submitted by Plaintiffs." (*See* MR Tab J at 3-4.) In reasoning further, the basis for this bold statement is simply that BCH's expert did not testify to a dollar amount.

But this is of no consequence. If this were the law, then attorney's fees could never be reduced solely on cross-examination of the expert testifying to attorney's fees—unless she gratuitously reduced the amount herself. This is not the law. A party disputing attorney's fees can put the reasonableness of certain fees at issue solely based on cross-examination of the expert seeking fees. *See, e.g., Cullins v. Foster*, 171 S.W.3d 521, 537-39 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (rejecting that attorney's fees were established as a matter of law where the only witness to testify on fees was cross-examined on segregation and other issues).

That is, of course, not what happened here, as BCH's expert, Mr. Kitchens, testified (1) what fees could have been avoided by seeking summary judgment sooner and (2) what the fees would have been in a usual and customary case based on his experience. Notwithstanding, cross-examination of Wohlrabe's expert, Mr. Elrod, alone would have allowed reducing the fees, particularly since the jury is the sole judge of the credibility of witnesses. *See Cullins*, 171 S.W.3d at 537-39.

TAB 1

Wohlrabe further argued in the trial court that because there is not some reasoning that would support the actual dollar amount awarded by the jury, it is not supported. But the case law belies this argument. *See, e.g., Garcia v. Gomez*, 319 S.W.3d 638, 641-42 (Tex. 2010); *Powell*, 356 S.W.3d at 127-29.

A jury can award within a range of fees. This is precisely what the jury did here, by either calculation of the suggested floor. Also, if there is evidence from which the fees sought could be undercut, including solely from cross-examination of the attorney seeking fees, the jury may do so. *See Powell*, 356 S.W.3d at 127-29; *Cullins*, 171 S.W.3d at 537-39. Such evidence was abundant here.

Simply put, the law does not require an amount be specifically uttered to the jury for the jury to award that amount in attorney's fees.

## B. The attorney's fees sought by Wohlrabe were contradicted.

That the fees were contradicted is most obviously shown by the testimony of Mr. Kitchens, BCH's expert. But the fees were also contradicted by cross-examination of BCH's expert.

For example, the jury heard abundant evidence from which it could have (and apparently did) view with skepticism Wohlrabe's exorbitant claim for attorney's fees. This included:

57

TAB 1

- The initial fee agreement noted that the clients (Wohlrabe and her Association) were being provided services from Wohlrabe pro bono, then suddenly the matter was converted to seek fees (MR Tab N at 71);

- The fee agreement to which it was converted, in an HOA deed restriction case with no actual damages, was a contingency fee case—something unheard of in an HOA deed restriction case (MR Tab N at 67-68);

- The redactions and failure to describe for the jury what research was performed specifically in the fee statements did not allow the jury to ascertain what portion of the fees should have been segregated as between recoverable and non-recoverable claims (MR Tab N at 122–23; MR Tab N at 84–88);

- The redactions and failure to describe for the jury what research was performed specifically in the fee statements did not allow the jury to determine the reasonableness of such entries and fees (*Id.*); and

- The client (Wohlrabe and the Association—of which she is the director and set up solely for this litigation) is the attorney, and attorney is the client.

This evidence undercut Wohlrabe's claims for the exorbitant amount of attorney's fees sought. When combined with credibility issues for Wohlrabe's attorney's fees' expert, there is factually sufficient evidence supporting the lower amount awarded by the jury.

The trial court instructed the jury in its charge that it was "the sole judges of the credibility of the witnesses and the weight to be given their testimony." (MR Tab I at 1.) Apparently, the jury took this to heart in

58

TAB 1

awarding an amount lower than what Mr. Elrod told them he wanted and deserved.

More specifically, Mr. Elrod presented with credibility issues. Mind you, Mr. Elrod is a fine lawyer who has handled some very significant cases of very significant value. He certainly testified extensively about his wins and "notches on his belt."

For the jury, though, the problem may have been that in his 38 years of practicing law, this was only his second HOA case. (MR Tab M at 103.) For all the experience Mr. Elrod has, he readily admitted that he has rarely handled HOA cases (one other in his career), and does not specialize in this area. (MR Tab M at 103.)

From this testimony, it is not a stretch for the jury to conclude his lack of experience in these types of cases unnecessarily and unreasonably drove up the fees. In fact, BCH argued this to the jury in closing arguments. (MR Tab N at 191.) When combined with the testimony of BCH's expert Travis Kitchens—about how a typical case should be handled—this is likely another reason the jury reduced the award.

Specifically, Mr. Kitchens testified on multiple occasions that the fees sought by Wohlrabe were unreasonable. He also specified the facts and evidence on which this was based.

59

TAB 1

For starters, Wohlrabe waited well over a year after obtaining a temporary injunction to seek a permanent injunction (by summary judgment). (MR Tab N at 76-80.) Mr. Kitchens testified that this delay resulted in unnecessary fees from February 2014 (45 days after the temporary injunction was granted on December 13, 2013) to February 2015 (when the first summary judgment and permanent injunction was granted). (*Id.*) The fees in that time period—taken straight from Wohlrabe's exhibit summarizing the fees by month—total $361,836.50. (*See* MR Tab N at 79; MR Tab O at 1–3.) When this amount is subtracted from the amount sought by Plaintiffs, the modified total is $218,117.95.

This modified amount of $218,117.95 served as one floor for the award of attorney's fees. And under this calculation—firmly supported by the evidence—the range of recoverable attorney's fees (assuming proper segregation) is $218,117.95-$579,954.45. The jury's award of $290,000 is squarely within this range.

But there was another alternative measure from which the jury could have reduced fees. Mr. Kitchens testified that there is a typical and reasonable manner in which to handle an HOA deed restriction case. (MR Tab N at 99-104.) Mr. Kitchens testified that the law is not complex in these cases. (MR Tab N at 84.)

TAB 1

He then explained, from his experience, the usual and customary manner in which such cases are handled. (MR Tab N at 99-104.) He detailed—task by task—the number of hours it should take to work up such a case. (*Id.*) If the high end of his range for handling such a case is calculated, it totals 620 hours. (*Id.*) Using Mr. Farlow (lead counsel) and Ms. Wohlrabe's hourly rate of $275, this totals $170,500. If the lower end of the range was used, the figure would drop further—to approximately $150,000. This amount of $150,000-$170,500 provides a second floor to which the jury could have reduced fees. The jury awarded approximately $120,000-$140,000 more than this floor in awarding $290,000.

Wohlrabe does not like the jury award. But there is factually sufficient evidence to support an award of $290,000.

Given the battle of experts, cross-examination of Wohlrabe's expert, and other evidence regarding the exorbitant fees and incestuous relationship between Wohlrabe as client and attorney/her law firm, the jury award is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cullins v. Foster*, 171 S.W.3d 521, 539 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Therefore, granting a new trial based on the jury's award of $290,000 in attorney's fees is legally invalid.

TAB 1

## CONCLUSION

In virtually every manner, the trial court played favorites and showed preference for one side, all the while ignoring established legal principles. This is particularly true for the jury trial on attorney's fees. In doing so, the trial court exacted on BCH unequal justice above the law.

The trial court severely impeded BCH's ability to examine witnesses, including sustaining objection after objection without Wohlrabe even stating a basis. The court also found violations of limine orders which did not even implicate the orders, much less were improper. Finally, the court disallowed closing argument that was proper, and certainly not incurable such that Wohlrabe could fail to object, request a curative instruction, or seek a mistrial and still preserve error to later seek a new trial.

Notwithstanding, the jury heard the evidence/arguments and rendered a verdict on attorney's fees. There was factually sufficient evidence to support the verdict.

Yet the trial court—again administering unequal justice above the law—granted a new trial by an order listing trumped up charges of indiscretions by BCH. None of these is a proper basis for a new trial, either because the questions or arguments were not improper, or the error was

62

**TAB 1**

not preserved (including because the questions and arguments were not incurable).

One could ask, what is the harm in conducting a new trial on attorney's fees? After all, it would be a short trial on attorney's fees, then a judgment entered from which the parties could appeal. The simple answer is a new trial is not proper. There is no legal basis for the trial court granting a new trial.

But beyond a second trial, what happens next? What if the second jury awards $350,000 in attorney's fees? Surely, Wohlrabe will seek a third trial, and the trial court will undoubtedly grant it. What about if the jury awards $400,000 at the third trial? Wohlrabe will then seek a fourth trial, and the trial court will undoubtedly grant it. There are only two ends to to this cycle: Wohlrabe finds a jury that is willing to simply rubber-stamp attorney's fees of $579,954.45 (or more for each re-trial), or this Court puts an end to it here.

This Court should grant mandamus to correct the clear abuses of discretion by the trial court. Specifically, the Court should reverse the order granting new trial and render judgment on the jury verdict (or order the trial court to do so).

63

TAB 1

# PRAYER

Relators pray that this Fifth District Court of Appeals:

(1)     grant mandamus relief by finding that the trial court clearly abused its discretion, and has left Relators without an adequate remedy on appeal, in granting Plaintiffs' motion for new trial;

(2)     reverse the trial court's Order Granting New Trial and either enter judgment on the jury verdict or order the trial court to do so; and

(3)     award such other relief to which Relator may be entitled.

Respectfully submitted,

THOMPSON, COE, COUSINS & IRONS, L.L.P.


By: /s/ Michael A. Yanof
     Michael A. Yanof
     State Bar No. 24003215
     Thomas A. Culpepper
     State Bar No. 05215650
     Cassie J. Dallas
     State Bar No. 24074105

     700 North Pearl St., 25th Floor
     Dallas, Texas 75201
     Telephone:  (214) 871-8200
     Facsimile:  (214) 871-8209
     E-Mail: myanof@thompsoncoe.com
     E-Mail: tculpepper@thompsoncoe.com

**COUNSEL FOR RELATOR
BCH DEVELOPMENT, LLC**

TAB 1

## CERTIFICATE OF SERVICE

I certify that on December 16, 2016, a true and correct copy of this Petition for Writ of Mandamus was served on the following parties by electronic service or certified mail, return receipt requested (depending on whether each is registered to receive electronic service):

Brian A. Farlow (trial counsel)
Gruber Elrod Johansen Hail Shank,
LLP,
1445 Ross Avenue
Suite 2500
Dallas, Texas 75202
Telephone: (214) 855–6800
**Attorneys for Real Parties in
Interest**

Hon. D'Metria Benson
County Court at Law No. 1
George L. Allen, Sr. Courts Building
600 Commerce Street
Suite 550
Dallas, TX 75202

/s/ Michael A. Yanof
Michael A. Yanof

65

**TAB 1**

## CERTIFICATION PURSUANT TO TEX. R. APP. P. 52.3(j)

I certify that I have reviewed this Petition for Writ of Mandamus and concluded that every factual statement in the petition is supported by competent evidence included in the appendix and or record.

/s/ Michael A. Yanof
Michael A. Yanof

TAB 1

## COMPLIANCE WITH TEX. R. APP. P. 9.4(i)(2)(B)

This Petition for Writ of Mandamus contains 11,140 words, as calculated by Texas Rule of Appellate Procedure 9.4(i)(1).

/s/ Michael A. Yanof
Michael A. Yanof

TAB 1

**INDEX TO APPENDIX TO
PETITION FOR WRIT OF MANDAMUS**

Certification Pursuant to Texas Rule of Appellate Procedure 52.3(k)

9/21/16 Order Granting Plaintiffs' Motion for New Trial (MR Tab L)          Tab 1

**TAB 1**

## CERTIFICATION PURSUANT TO
## TEXAS RULE OF APPELLATE PROCEDURE 52.3(k)

BEFORE ME, the undersigned authority, on this day personally appeared Cassie J. Dallas, the undersigned Affiant, who being first duly sworn, did depose and say the following:

"My name is Cassie J. Dallas. I am over the age of eighteen, of sound mind, capable of making this Affidavit, and fully competent to testify to the matters stated herein as appellate counsel for Relators in this Petition for Writ of Mandamus. I have personal knowledge of the facts stated herein, and they are true and correct.

I certify that Appendix Tab 1 to this Petition for Writ of Mandamus is a true and correct copy of the order signed by the trial court on which this Petition for Writ of Mandamus is based."

_____
Cassie J. Dallas, Affiant

**SUBSCRIBED AND SWORN TO BEFORE ME**, on the ___16th___ day of December, 2016, to certify which witness my hand and official seal.

JONI SULLIVAN
Notary ID 658834-7
My Commission Expires
August 15, 2018

_____
Notary Public in and for the State of Texas

**TAB 1**

Cause No. CC-13-05900-A

| | | |
|---|---|---|
| LAKEVIEW HEIGHTS ADDITION PROPERTY OWNERS' ASSOCIATION and BARBARA WOHLRABE | § § § § | IN THE COUNTY COURT |
| *Plaintiffs/Counter-Defendants,* | § § § | |
| v. | § § | |
| BCH DEVELOPMENT, LLC; and BLANCHARD HOMES, LLC | § § § § | |
| *Defendants/Counter-Plaintiffs.* | § § § | |
| v. | § § | AT LAW NO. 1 |
| GORDON BRUCE, MONICA BRUCE, GEORGE BUTLER, NEIL TURNER L. ELAINE TRICOLI, CHRISTOPHER STILLO, SANDY STILLO, CYNTHIA SCHWEIZER, LINDA BONDS, GEORGINA BRUNSON, BEN BRUNSON DANIEL CLARK, BARBARA WOHLRABE, HEIDI PETTIT, ROBERT RYAN PETTIT, ELISA JOHNSON, JEREMY THOMPSON, JENNIFER VICK, TANNER VICK, EDWARD FAROW, KATIE SKINNER, NATHAN SKINNER LISA READY, LEX READY, MARGARET ABRUSLEY, AMANDA G. SHORT, AND PETE PINEDA, JR. | § § § § § § § § § § § § § § § § § § § § § § | |
| *Counter-Defendants* | § | DALLAS COUNTY, TEXAS |

CC-13-06900-A
CONT
ORDER – NEW TRIAL
1163436

## ORDER GRANTING PLAINTIFFS' MOTION FOR NEW TRIAL

Came on for consideration, Plaintiffs' Motion for Judgment Notwithstanding the Verdict or, Alternatively, Motion for New Trial (the "Motion"). After considering the Motion and the arguments of counsel, the Court finds that Plaintiffs' motion for new trial is with merit and

ORDER GRANTING PLAINTIFFS' MOTION FOR NEW TRIAL

Page 1

TAB 1

TAB 1

should be granted.

Plaintiffs' motion for new trial is granted on the following grounds:

1.     Due to Defendant BCH Development, LLC's failure to make sufficient pre-trial expert disclosures as required under the Texas Rules of Civil Procedure, the Court made various pre-trial rulings excluding and limiting certain expert evidence and testimony, as well as any reference to such evidence and testimony.  Specifically, the Court prohibited Defendant's attorney-fee expert from presenting (i) evidence concerning any specific amount of attorney's fees which Defendant's attorney-fee expert intended to testify was a reasonable amount of fees for the services of Plaintiffs' attorneys in this matter, (ii) evidence concerning any specific number of hours which Defendant's attorney fee expert intended to testify was a reasonable number of hours for Plaintiffs' attorneys to have expended in representing the Plaintiffs in this matter, (iii) evidence concerning the reasonable fees that are charged in Dallas County, Texas, (iv) evidence concerning any specific dollar amount of attorney's fees, or any specific number of attorney hours, which should have been segregated from the fees requested by Plaintiffs, and (v) evidence concerning any percentage to apply to Plaintiffs' attorney fee evidence in order to arrive at a reasonable attorney's fee in the case.

2.     Despite and in contravention of the Court's rulings, Defendant attempted to place such excluded matters before the jury both through the testimony of Defendant's expert witness and through argument to the jury, including (i) testimony concerning the number of hours Defendant's expert believed would be reasonable for prosecution of a deed restriction case like this one, and (ii) jury argument that $150,000 was a reasonable attorney's fee through trial and could be calculated by subtracting a certain amount of fees from the $579,954.45 fees sought by Plaintiffs.

**ORDER GRANTING PLAINTIFFS' MOTION FOR NEW TRIAL**

**Page 2**

**TAB 1**

**TAB 1**

3. Defendant made several attempts to present testimony and argument to the jury that Plaintiffs' attorneys' use of "block billing" in their attorney fee statements was somehow improper or impermissible under the law and that as a result Plaintiffs should not recover some portion of their attorney's fees. Despite the Court having granted Plaintiffs' request for a supplemental limine order excluding any testimony, evidence or argument that any law requires a party seeking to recover attorney's fees to prepare attorney fee statements which utilize "task billing," or that any law prohibits "block billing" (and the Court granting Plaintiffs' request for a curative instruction to the jury,) Defendant proceeded to ignore the supplemental limine order by (i) posing questions to its expert witness which improperly touched upon the block billing issue, and (ii) arguing to the jury that Plaintiffs' attorney's fees should be reduced due to the fact that their attorneys' fee statements did not include itemizations of the time spent on each task.

4. Defendant engaged in improper jury argument which was inflammatory, contained unsupported, extreme and personal attacks on the Plaintiffs and their attorneys, was unsupported by the evidence, was unsupported by the law or was contrary to the law, and which was calculated to cause prejudice to the Plaintiffs and had the effect of striking at and harming the judicial system itself, including:

(i) argument to the jury that "this case was about a lawyer money grab from day one";

(ii) argument to the jury attacking the creation of an association by certain property owners in the Lakeview Heights Addition and the filing of this suit by the association on their behalf, even though Texas law expressly permits the creation of such an association and permits the filing of suit by a property owner's designated representative, and Defendant introduced no evidence that the filing of

**ORDER GRANTING PLAINTIFFS' MOTION FOR NEW TRIAL**

Page 3

**TAB 1**

**TAB 1**

suit by the Association rather than by each of its individual members unreasonably or unnecessarily increased the Plaintiffs' legal fees;

(iii)    argument to the jury attacking the Plaintiffs' use of a contingency fee arrangement with their counsel by making the legally unsupported assertion that contingency fee arrangements are only to be used by people who can't afford to pay an attorney, as well as the factually unsupported argument that Plaintiff Wohlrabe could pay for legal services if she wanted to;

(iv)    argument to the jury attacking the propriety of Plaintiffs' contingency fee arrangement by making the assertions that under the agreement the Plaintiffs are never going to have to pay any fees and that the only way for them to obtain a recovery is to create fees;

(v)    factually unsupported argument to the jury that under the Plaintiffs' contingency fee arrangement the only thing Plaintiffs could collect would be their attorney's fees, that the contingency fee agreements incentivized the attorneys to keep the law suit going as long as possible so they could "jet up" or "gin up" the attorney's fees and obtain a bigger attorney fee award, and that the attorney's fees were all that the Plaintiffs were fighting about, even though the gravamen of Plaintiffs' petition was their request for temporary and permanent injunctive relief;

(vi)    factually and legally unsupported argument to the jury that under the Plaintiffs' contingency fee arrangement the more time Plaintiffs' counsel puts in the case the more he recovers, and that this is the opposite of a typical contingency agreement;

(vii)    factually unsupported argument to the jury that Plaintiffs should have segregated hundreds of thousands of dollars related to a cause of action which was dropped

**ORDER GRANTING PLAINTIFFS' MOTION FOR NEW TRIAL**

**Page 4**

**TAB 1**

**TAB 1**

by Plaintiffs after it had been pending for years;

5.     The afore-listed jury argument was designed to cause prejudice and harm to Plaintiffs, struck at and damaged the integrity of the judicial system itself, and was incurable. Defendant's repeated attacks on Plaintiffs and their counsel as having filed this suit simply as a "money grab" or an attempt to create attorney's fees or "jet up" or "gin up" attorney's fees, rather than for the legal and legitimate purpose of enforcing a neighborhood's deed restrictions, was not based on any evidence and was extreme, unsupported, and designed to turn the jury against Plaintiffs and their counsel.  Defendant's repeated attacks on Plaintiffs' use of a contingency fee arrangement with their counsel were unsupported by the law and were advanced for the purpose of attempting to characterize Plaintiffs and their counsel as greedy and as having pursued this legal action solely in order to extract money from Defendant.

6.     The cumulative effect of Defendant's violations of the Court's rulings, as outlined above, and of Defendant's extreme, unsupported, and improper jury argument, as outlined above, might reasonably have resulted in, and probably did result in, an improper verdict and harm to the Plaintiffs which was incurable.

7.     In addition, there was insufficient evidence to support the jury's finding that $290,000 is a reasonable attorney's fee for Plaintiffs through trial of the case and the finding is against the overwhelming weight of the evidence.   There was no expert testimony or other evidence that $290,000 was a reasonable attorney's fee through trial in this case and there was insufficient evidence to support any figure or range of figures that the jury might have used to determine that a reasonable attorney's fee through trial in this case was $290,000.  The only dollar figure presented to the jury as to Plaintiffs' reasonable attorney's fees through trial was the $579,954.45 figure presented by Plaintiffs.  There was insufficient evidence to support the

**ORDER GRANTING PLAINTIFFS' MOTION FOR NEW TRIAL**

Page 5

**TAB 1**

**TAB 1**

$150,000 figure that Defendant sought to present to the jury because (i) there was no testimony or other evidence to support the $150,000 figure, and (ii) Defendant's expert's testimony concerning legal fees which might not have been incurred had Plaintiffs filed their summary judgment motion four months earlier was incomplete and insufficient to support Defendant's $150,000 figure.

8.    For the foregoing reasons, the Court concludes that good cause exists for a new trial of Plaintiffs' claim for attorney's fees through the trial of the case.

THEREFORE, it is ORDERED, ADJUDGED AND DECREED that Plaintiffs' Motion for New Trial is GRANTED.

SIGNED this _21st_ day of _September_, 2016.

_____
Judge Presiding

TAB 1

TAB 1



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-01481-CV

### IN RE BCH DEVELOPMENT, LLC, Relator

**On Appeal from the County Court at Law No. 1
Dallas County, Texas
Trial Court Cause No. CC-13-05900-A**

## OPINION

Before Justices Evans, Brown, and Schenck
Opinion by Justice Schenck

After the trial court granted real parties in interest's motion for summary judgment in this deed restriction case, the matter proceeded to a jury trial on attorney's fees pursuant to section 5.006 of the property code. TEX. PROP. CODE ANN. § 5.006 (West 2014). The jury returned a verdict awarding real parties in interest $290,000 in attorney's fees, rather than the full $579,954.45 they sought to recover. The trial court granted real parties in interest's request for a new trial.

Relator, BCH Development, LLC ("BCH"), filed a petition for writ of mandamus urging that we direct the trial court to vacate its new trial order because none of the specified reasons for ordering a new trial legally support relief in the form of a new trial. We agree and therefore conditionally grant mandamus relief and direct the trial court to vacate the September 21, 2016 Order Granting New Trial and enter a judgment on the jury verdict.

**TAB 2**

BACKGROUND

This case arises from BCH's attempt to construct a home with a habitable attic in the Lakeview Heights Addition. Barbara Wohlrabe and Lakeview Heights Addition Property Owners' Association (collectively, the "Association") brought suit against BCH and Blanchard Homes, LLC asserting they were breaching and violating deed restrictions and seeking to enjoin them from constructing a dwelling that has more than one above-ground level or floor of living space, and from constructing a dwelling that has a habitable attic. The Association also asserted a claim for tortious interference, which it later abandoned. After the trial court granted the Association's motion for summary judgment and permanently enjoined BCH from building a dwelling in the neighborhood in excess of one story and with a habitable attic, the Association nonsuited its claims against Blanchard Homes, LLC.

At trial, the only remaining issue was an award of attorney's fees under the property code. One of the Association's attorneys testified as the expert for the Association. He opined that fees in the amount of $579,954.45 were reasonable in pursuing the breach and violation of the deed restrictions claims in light of the extensive work that had been put into the case. On cross examination, he testified that the jury in a different, less complicated deed restriction case awarded $250,000 based on his testimony in that case. BCH's expert countered that the Association unnecessarily delayed seeking a summary judgment for a period of a year. The record—the Association's exhibit of its attorney's fees—shows that fees of approximately $361,000 accrued during the delay.[1] BCH's expert, who has handled hundreds of property owners' association cases, also testified as to what would be the reasonable hours expended during various phases of a deed restriction case. They totaled 500 to 600 hours. The jury

---

[1] BCH points out that the attorney's fees sought by the Association, in the amount of $579,954, less the fees incurred during this delay in moving for summary judgment, in the amount of $361,000, equals approximately $218,000. The Association responds that these amounts and this calculation were never mentioned to the jury.

returned a verdict awarding the Association $290,000.  The Association moved for judgment notwithstanding the verdict or for a new trial.  The trial court granted the Association's motion for new trial.  This original proceeding followed.

## STANDARD FOR GRANTING MANDAMUS—ORDER GRANTING NEW TRIAL

A trial court's order granting a new trial after a jury trial is subject to mandamus review. *In re Zimmer, Inc.*, 451 S.W.3d 893, 898 (Tex. App.—Dallas 2014, orig. proceeding) (citing *In re United Scaffolding, Inc.*, 377 S.W.3d 685, 688–89 (Tex. 2012) (orig. proceeding)).  A new trial order must initially satisfy two "facial requirements."  *In re Bent*, 487 S.W.3d 170, 173 (Tex. 2016) (orig. proceeding).  One, the order must state a legally appropriate reason for the new trial.  *Id.*  Two, the stated reason must be specific enough to indicate that the trial court did not simply parrot a pro forma template but rather derived the articulated reason from the case's particular facts and circumstances.  *Id.*  The order must satisfy both requirements, or it reflects an abuse of discretion correctable by mandamus.  *See United Scaffolding*, 377 S.W.3d at 688–89.

Further, even if a new trial order meets the facial requirements, a relator can show an abuse of discretion and an entitlement to mandamus relief if, after a merits review, the record does not support the trial court's rationale for ordering a new trial.  *Bent*, 487 S.W.3d at 173; *In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 749 (Tex. 2013) (orig. proceeding).

## DISCUSSION

A. Were the trial court's reasons for ordering a new trial both sufficiently specific and legally appropriate?

The order in this case cites (1) BCH's violation of limine orders limiting the scope of BCH's attorney fee expert's testimony,[2] (2) BCH's improper jury argument attacking the

---

[2] The Order Granting Plaintiffs' Motion for New Trial identifies BCH's expert's testimony concerning the number of hours he believed would be reasonable for prosecution of a deed restriction case like this one, and BCH's attempts to present testimony that plaintiffs' attorneys' "block billing" statements were somehow improper or impermissible, as violations of limine orders.

Association and its attorneys, criticizing the use of a contingency fee agreement and lack of segregation of fees, and stating that $150,000 was a reasonable fee through trial, and (3) factual and legal insufficiency of the evidence to support the jury's award of $290,000 in attorney's fees, as its bases for granting a new trial. Violation of limine orders, improper jury argument, and insufficiency of the evidence, if established, can serve as legally proper reasons for granting a new trial. *See In re United Servs. Auto. Ass'n*¸ 446 S.W.3d 162, 174 (Tex. App.—Houston [1st Dist.] 2014, orig. proceeding) (the violation of a limine order can serve as a basis for a new trial order), *mand. denied*, 487 S.W.3d 170 (Tex. 2016); *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 681–82 (Tex. 2008) (holding that improper incurable jury argument is a legally appropriate ground for a new trial); *Zimmer*, 451 S.W.3d at 898 (noting that factual insufficiency of the evidence to support the jury's verdict, if established, is a legally proper reason for granting a new trial). Thus, the order complies with the first facial requirement. *Toyota*, 407 S.W.3d at 756–57.

The trial court's order also satisfies the second requirement of specificity. It recites the specific facts and circumstances of the case that led the trial judge to reach her conclusions. The order is specific enough both to permit BCH to attack it and to enable our review. *See Zimmer*, 451 S.W.3d at 898.

B. Were the trial court's reasons for granting a new trial valid and correct?

Simply articulating understandable, reasonably specific, and legally appropriate reasons is not enough to sustain a new trial order; the reasons must be valid and correct. *Id.* (citing *Toyota*, 407 S.W.3d at 759). We must conduct a careful "merits review" of the record. *See Toyota*, 407 S.W.3d at 759. In a mandamus proceeding, we may not substitute our judgment for that of the trial court. *In re Sanders,* 153 S.W.3d 54, 56 (Tex. 2004) (orig. proceeding). But neither may the trial court substitute its judgment for that of the jury in granting a new trial.

*re Columbia Med. Ctr. of Las Colinas*, 290 S.W.3d 204, 212 (Tex. 2009) (orig. proceeding); *Toyota,* 407 S.W.3d at 758 ("If . . . a trial court's articulated reasons are not supported by the underlying record, the new trial order cannot stand."). Thus, using a factual sufficiency standard, we will engage in a review of the entire trial record to determine whether it supports the trial court's reasons for granting a new trial. *See Bent*, 487 S.W.3d at 180. If the record does not support the trial court's stated reasons, then the trial court will have abused its discretion in granting a new trial. *See Toyota*, 407 S.W.3d at 761 (holding the trial court abused its discretion by granting a new trial because the record did not support the articulated reason).

1. Limine Orders and Jury Arguments

As to the trial court's assertion that BCH's alleged violations of motion-in-limine orders are bases for granting a new trial, we note that the purpose of a motion in limine is to prevent a party from asking prejudicial questions and introducing evidence in front of the jury without first asking the court's permission. *See Weidner v. Sanchez*, 14 S.W.3d 353, 363 (Tex. App.— Houston [14th Dist.] 2000, no pet.). A motion in limine itself preserves nothing for review. *In re R.V. Jr.*, 977 S.W.2d 777, 780 (Tex. App.—Fort Worth 1998, no pet.). The complaining party must immediately object and also request the trial court to instruct the jury to disregard the evidence introduced in violation of a limine order. *State Bar of Tex. v. Evans*, 774 S.W.2d 656, 658 n.6 (Tex. 1989) (per curiam); *Weidner*, 14 S.W.3d at 363.

Before BCH called its expert witness to testify, the Association moved to exclude certain testimony of this witness, arguing BCH failed to disclose certain expert opinions the Association believed BCH would attempt to elicit based on BCH's opening statement. In response, the trial court ruled that BCH's expert would not be allowed to opine as to (1) the appropriate amount of fees that should be segregated, (2) the reasonable hourly rates in Dallas County (BCH conceded its expert would not be challenging the Association's expert's opinion on reasonable rates), and

(3) the specific amount that should have been charged.

The trial court considered BCH's attempt to present testimony concerning the number of hours that would be reasonable for prosecution of a deed restriction case like this one, and attempt to present testimony that the Association's attorneys' "block billing" statements were somehow improper, to violate its limine orders. A review of the challenged comments reveals, however, that they did not reach into any of the topics precluded by the motion and the resulting order.

As for BCH's expert's testimony concerning a reasonable number of hours for prosecution of a case like this, in connection with the Association's request that BCH's expert be precluded from testifying on certain matters, the trial court affirmatively permitted that testimony, indicating that he could "say that, in his experience, someone working on a summary judgment of the type that was permitted or presented in this case would have been 20 hours not 60 hours." The court went on to clarify, after BCH's attorney asked whether he could ask the expert how many billable hours it should take to drive this type of case to resolution based upon his experience, that "he can testify as to the hours, but not to the amounts." Thus, BCH's expert's testimony concerning billable hours did not violate a limine order and cannot serve as a legally proper reason for granting a new trial.

As to testimony concerning "block billing," it also was not subject to a limine order. In fact, BCH's attorney elicited testimony concerning block billing from the Association's expert witness on cross examination without objection.[3] In addition, the Association's own attorney

---

[3] The following exchange occurred between BCH's counsel and the Association's expert witness:

Q. And when you bill in this manner, sir, is that commonly required [sic] to as block billing?
A. It's called block billing.
Q. And is it your understanding that Courts disfavor block billing?
A. Absolutely not. In fact, I've testified in attorneys' fees cases where we don't even introduce the fee statements. It's not required.
Q. And so is it your testimony that Courts do not -- or do you have an opinion -- let me strike that. Have you read any cases about block billing and whether the Court -- whether Courts favor block billing?

questioned its expert on block billing.[4]  The trial court did not enter a limine order concerning testimony, evidence, or argument as to whether task billing was necessary until after the Association's expert had already testified.  Thus, testimony elicited from the Association's expert concerning "block billing" did not violate a limine order and cannot serve as a legally proper reason for granting a new trial.

When BCH's counsel attempted to question BCH's expert as to what block billing does to the bill, the Association objected and the court sustained the objection before the basis for the objection could be stated.  BCH's expert did not answer the question.  Thereafter, the trial court instructed the jury as follows:

> Ladies and gentlemen of the jury, I just want to give you an instruction that – or an admonition to follow.  You have previously heard examination questions, arguments, or testimony which may have caused you to believe that Texas law prohibits block billing in an attorneys' fee statement.  That is an incorrect statement of Texas law.  You are to disregard questions, arguments, or testimony with regard to the issue of block billing.

---

A.   It depends on what Court you're in.  If you're in a bankruptcy court, you cannot block bill.
Q.   Okay.  Have you read any cases from the Fifth Circuit about what they think about block billing?
A.   It depends if you're talking about a bankruptcy case.  If you're talking about a bankruptcy case, the Fifth Circuit says you can't block bill in bankruptcy cases because that's a debtor, and the bankruptcy courts won't let you block bill.
Q.   What about non-bankruptcy cases, sir?
A.   In non-bankruptcy cases, no, I'm not familiar with any prohibition by the Fifth Circuit in block billing to get attorneys' fees. If you have the case, let me see it please.
. . . .
Q.   So, at least as far as you're concerned, there is -- block billing is fine, true?
A.   In getting recovery of attorneys' fees in Texas under 5.006, block billing is fine because you don't even have to introduce your fee statements.
Q.   Have you ever done any research about block billing yourself? Have you done any?
A.   Yes.
Q.   Okay. You have done research on block billing?
A.   In bankruptcy cases, yes.
Q.   In non-bankruptcy cases, sir.  I'm talking about civil cases that aren't bankruptcy cases.
A.   Mr. Culpepper, I'm pretty much aware of the cases that have to deal with proving up attorneys' fees in state court in Texas, and I'm not familiar with a case that says you cannot block bill and recover attorneys' fees.  If you have one, I'd be happy to read it. I'm not familiar with a case that prohibits block billing.

[4] The following exchange took place between the Association's counsel and the Association's expert:

Q.   Now there was a great deal of talk about-- he mentioned block billing. And would the other type of billing where you put the amount down for each individual task be called task billing?
A.   It's task billing.
Q.   And, [Association's expert], is it your opinion -- are you aware of any opinion which prohibits the recovery of attorneys' fees based on block billing?
A.   Absolutely not. That [sic] why he -- if he's got one, I wanted Mr. Culpepper to show me because I'm not aware of one.
Q.   Have -- now while you might be able to task bill in a case, is there anything wrong with block billing?
A.   Absolutely not. That's why I said for 12 percent of our clients, we bill block bill. For 10 percent, we task bill. It's a specific request by client. If you're doing bankruptcy work, the bankruptcy -- if you're doing litigation for a debtor in a bankruptcy case, then the bankruptcy court requires you to do task billing, not block billing.

When a trial court instructs the jury to disregard evidence offered in violation of a motion in limine, we may review that evidence to determine whether an instruction to disregard was adequate to cure its admission. *In re City of Houston*, 418 S.W.3d 388, 397 (Tex. App.—Houston [1st Dist.] 2013, orig. proceeding). "Violations of an order on a motion in limine are incurable if instructions to the jury would not eliminate the danger of prejudice." *Dove v. Dir., State Emps. Workers' Comp. Div.*, 857 S.W.2d 577, 580 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (citing *Dennis v. Hulse*, 362 S.W.2d 308, 309 (Tex. 1962)). We presume that jurors follow the instructions they are given. *Taylor v. Fabritech, Inc.*, 132 S.W.3d 613, 626 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). In this case, there is no reason to conclude that the instruction actually failed to cure the effect of an unanswered question concerning block billing. Thus, to the extent the trial court granted a new trial on that basis, it cannot serve as a legally proper reason for granting a new trial.

As to the trial court's assertion that BCH engaged in improper jury argument during closing argument, we note that a litigant is entitled to have his counsel argue the facts of the case to the jury. *Clark v. Bres*, 217 S.W.3d 501, 510 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (citing *Texas Sand Co. v. Shield*, 381 S.W.2d 48, 57–58 (Tex. 1964)). Reasonable inferences and deductions from the evidence are permissible as well during closing argument. *PopCap Games, Inc. v. MumboJumbo, L.L.C.*, 350 S.W.3d 699, 721 (Tex. App.—Dallas 2011, pet. denied). Hyperbole is also generally a permissible rhetorical technique in closing argument. *Id.* Counsel may comment on the credibility of witnesses. *See id.* at 722 (arguing that jury should accept one witness's opinion instead of another's was not improper). Trial counsel should be given wide latitude in arguing the evidence and the reasonable inferences from the evidence to the jury. *Clark*, 217 S.W.3d at 510.

A complaint about improper, but curable, jury argument is waived by the failure to object at trial. *Standard Fire Ins. v. Reese*, 584 S.W.2d 835, 841 (Tex. 1979). A complaint of incurable jury argument, however, may be asserted and preserved in a motion for new trial, even in the absence of a timely objection during trial. TEX. R. CIV. P. 324(b)(5); *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009). Instances of incurable improper jury arguments are rare. *See Penalver*, 256 S.W.3d at 680. Examples of incurable improper jury arguments can include appeals to racial prejudice, unsupported accusations of witness tampering by the opposing party, and unsupported, extreme, and personal attacks on opposing parties and witnesses. *Id.* at 681; *see also Cottman Transmission Sys., L.L.C. v. FVLR Enters., L.L.C.*, 295 S.W.3d 372, 380 (Tex. App.—Dallas 2009, pet. denied) (recognizing that incurable argument can include unsupported charges of perjury and the use of inflammatory epithets such as "liar" and "cheat").

Of the closing argument statements the trial court considered to be improper, the Association objected to only BCH's attorney's statements that $150,000 was a reasonable fee in this case and "You can't – the other expert can't segregate." The Fourteenth Court of Appeals decided that trial error that is not preserved for appellate review is not available as proper grounds for a new trial. *In re Athans*, 478 S.W.3d 128, 139 (Tex. App.—Houston [14th Dist.] 2015) (orig. proceeding). We agree. We conclude the unobjected to arguments the trial court considered to be attacks against the Association and its attorneys and critical of the use of a contingency fee agreement were not preserved and did not amount to fundamental error. Thus, they cannot serve as legally proper reasons for granting a new trial.

As to the jury argument that $150,000 was a reasonable attorney's fee through trial, in accordance with the trial court's directive, BCH's expert testified concerning reasonable billable hours in a case like this. They totaled 500 to 600 hours. The evidence established Wohlrabe, who is an attorney with the firm representing the Association, charges $300 per hour for her

professional services. Thus, BCH's comment that a reasonable fee was $150,000 was a reasonable inference or deduction from the evidence, and did not violate the trial court's limine order concerning a specific amount of fees, because the order was directed to BCH's expert's testimony, not to BCH's attorney and argument. Thus, the argument was not improper.

As to argument concerning segregation of fees, BCH's counsel stated:

And [the Association's expert] told you, well, I took out $25,000. If you look at the fee statements, remember he had a cause of action for years, one whole cause of action that he dropped, he couldn't recover attorney's fees on. And he's saying, but that was only $25,000. If you look at the fee statements, you will see that they should have segregated hundreds of thousands of dollars related to that claim.

Counsel for the Association objected to this statement without stating the grounds, and the trial court sustained the objection. The evidence established that segregation of recoverable fees from non-recoverable fees was required in this case. The jury heard evidence that the fees were not sufficiently segregated, that the fees related to the tortious interference with contract claim were not recoverable, and that the tortious interference with contract claim was dismissed after it had been pending for years. Thus, BCH's counsel's comments about the $25,000 segregation and the claim upon which the Association could not recover were comments on the facts and reasonable inferences therefrom. BCH's counsel referred the jury to the fee statements, which were in evidence, to decide the issue of segregation itself and the comment about hundreds of thousands of dollars was hyperbole. The arguments were, thus, not improper.

Accordingly, the arguments cited as reasons for granting a new trial are not correct or legally appropriate bases upon which to order a new trial.

2. Sufficiency of the Evidence

As to the sufficiency of the evidence to support the jury's verdict, the trial court stated there was no expert testimony or other evidence that $290,000 was a reasonable attorney's fee in this case and there was insufficient evidence to support any figure or range of figures that the

jury might have used to determine that a reasonable attorney's fee in this case was $290,000. The court continued by stating the only dollar figure presented to the jury as to the Association's reasonable attorney's fees was the $579,954.45 figure presented by the Association. We disagree.

When a party puts on evidence that contradicts the fees sought by the plaintiff—whether by cross examination of the plaintiff's expert or by presenting its own expert—the trier of fact is not bound to the number provided by the plaintiff's expert. *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 128 (Tex. App.—Houston [1st Dist.] 2011, no pet.). While the Association's expert opined fees in the amount of $579,954.24 were reasonable and necessary, BCH's expert testified as to fees that could have been avoided by seeking summary judgment earlier in the case, and opined that a case like this one should have required 500 to 600 hours of attorney time. The evidence also established Wohlrabe's billable rate is $300 per hour. And 500 hours at $300 per hour equates to a minimum of $150,000, as noted previously. During closing argument, the trial court permitted, over objection, argument that "had [the Association] chosen to file [their motions for summary judgment] early on . . . they could have cut out a tremendous amount of fees they incurred after March of 2014 . . . . They said they incurred $429,381, if you add it up." Subtracting this sum from the claimed fees of approximately $579,000, leaves approximately $150,000.

Thus, the evidence showed a range of fees from $150,000 to slightly over $579,000. The jury awarded the Association $290,000, well within the range supported by the evidence. Under these circumstances, the evidence was sufficient to support the jury's award of $290,000. *See Garden Ridge, L.P. v. Clear Lake Ctr., L.P.*, 504 S.W.3d 428, 445 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *Ropa Expl. Corp. v. Barash Energy, Ltd.*, No. 02–11–00258–CV, 2013 WL 2631164, at *12 (Tex. App.—Fort Worth June 13, 2013, pet. denied) (mem. op.) (affirming

jury's award of attorney's fees despite the lack of documentary evidence supporting the award when the award was within the range of evidence presented at trial); *Pitts v. Dallas Cty. Bail Bond Bd.*, 23 S.W.3d 407, 415 (Tex. App.—Amarillo 2000, pet. denied) (affirming trial court's award of attorney's fees because the amount was within the range supported by the evidence); *see also, e.g.*, *Sw. Energy Prod. Co. v. Berry–Helfand*, 491 S.W.3d 699, 713 (Tex. 2016) ("The jury generally has discretion to award damages within the range of evidence presented at trial.").

Thus, to the extent the trial court granted a new trial based on factual insufficiency of the evidence to support the jury's award of $290,000 in attorney's fees, that reason is not correct or legally appropriate, and the trial court abused its discretion in granting a new trial for that reason.

To the extent the trial court granted a new trial on the basis of cumulative error, that basis is not a reason that is legally appropriate. When there are no errors, we reject cumulative error arguments. *Caro v. Sharp*, No. 03-02-00108-CV, 2003 WL 21354602, at *8 (Tex. App.—Austin June 12, 2003, pet. denied) (mem. op.).

## CONCLUSION

The trial court abused its discretion by granting a new trial based on grounds that were not legally appropriate. Therefore, we conditionally grant BCH's petition for writ of mandamus. A writ will issue only if the trial court fails to vacate its September 21, 2016 Order Granting New Trial and fails to enter a judgment on the jury's verdict.

/David J. Schenck/
DAVID J. SCHENCK
JUSTICE

161481F.P05

–12–
**TAB 2**